JOSEPH DUGAN ET AL. *v.* MOBILE MEDICAL
TESTING SERVICES, INC., ET AL.
(SC 16658)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued December 6, 2002—officially released September 23, 2003

*Lucia Lanzaro Goodwin*, with whom was *J. Michael Cantore, Jr.*, for the appellants (plaintiffs).

*Frank H. Santoro*, with whom, on the brief, was *R. Cornelius Danaher, Jr.*, for the appellees (defendants).

ZARELLA, J. This appeal raises a narrow issue of New York law, namely, whether a medical services provider hired by an employer to conduct a physical examination of an employee owes a duty of care to that employee. The named plaintiff, Joseph Dugan,[1] an employee of the city of Yonkers, New York, brought an action against the defendants, Mobile Medical Testing Services, Inc. (Mobile Medical),[2] and its president and chief operating officer, Richard B. Weltman, alleging, inter alia, that the defendants were negligent in failing to notify the plaintiff of the results of an abnormal electrocardiogram (EKG)[3] that Mobile Medical had generated in connection with its physical examination of the plaintiff. The trial court granted the defendants' motion for summary judgment on the ground that, under New York law, the defendants owed no duty of care to the plaintiff. We conclude that the trial court improperly granted the defendants' motion for summary judgment and, therefore, reverse the trial court's judgment rendered in favor of the defendants.

The following undisputed facts and procedural history are relevant to this appeal. In December, 1994, Mobile Medical entered into a contract with the city of Yonkers to provide physical examinations to firefighters employed by the Yonkers fire department (fire department) and, on the basis of those examinations, to determine whether the firefighters were fit for duty.

---

[1] Patricia Dugan, Joseph Dugan's wife, also is a plaintiff who seeks to recover from the defendants for loss of consortium. Both Patricia Dugan and Joseph Dugan are domiciliaries of Connecticut. In the interest of simplicity, we refer to Joseph Dugan as the plaintiff throughout this opinion.

[2] Mobile Medical is incorporated in Connecticut.

[3] An electrocardiogram or EKG consists of a series of waveforms depicting heart muscle activity. See Stedman's Medical Dictionary (27th Ed. 2000) p. 573. EKGs are used in the detection and diagnosis of heart abnormalities. See Mosby's Medical, Nursing and Allied Health Dictionary (6th Ed. 2002) p. 579.

The physical examinations consisted of an EKG,[4] a pulmonary function test and a fitness test, each of which was to be administered in accordance with standards established by the state of New York and the federal Occupational Safety and Health Administration.

On September 11, 1995, Mobile Medical personnel performed a physical examination of the plaintiff to evaluate his ability to continue working as an interior attack firefighter with the fire department. The examination occurred inside a specially equipped mobile van, which, at that time, was located in Yonkers. The examination was performed under the supervision of Gretchen Keefe, a physician.[5] During the examination, but following the administration of the EKG, the plaintiff asked Keefe about the results of his EKG and received the following response: "Everything looks fine. We only found one irregular heartbeat."[6] Allegedly as a result of this response, the plaintiff did not seek any subsequent medical treatment or additional testing. Thereafter, on November 4, 1995, the plaintiff suffered a heart attack at his home in Connecticut. On or about November 12, 1995, the plaintiff received a summary of his examination results from Mobile Medical, which informed the plaintiff that his EKG was abnormal and suggested that he should seek a follow-up consultation with his own physician.

The plaintiff brought the present action against the defendants, alleging that they negligently had failed to exercise reasonable care in notifying the plaintiff of his abnormal EKG. The defendants moved for summary judgment on the ground that they did not owe a duty

[4] See footnote 3 of this opinion.

[5] Gretchen Keefe was an employee of Mobile Medical and was the only physician present at the examination site on the day of the plaintiff's examination.

[6] The EKG subsequently was analyzed by Mobile Medical personnel in Connecticut.

to the plaintiff inasmuch as no physician-patient relationship existed between the parties. The trial court granted the defendants' motion.

As part of its analysis, the trial court addressed the threshold issue of whether to apply New York or Connecticut law. The court noted that, before it could determine which law to apply, it first was required to determine if a conflict existed, that is, if the relevant substantive law in each state was different.

The trial court then reviewed New York and Connecticut law regarding ordinary negligence and medical malpractice.[7] The trial court concluded that no conflict existed between New York and Connecticut law with respect to the negligence and medical malpractice issues arising in the present case. Specifically, with regard to medical malpractice claims, the trial court concluded that Connecticut courts have adopted the standards set forth in the decision of *Lee* v. *New York*, 162 App. Div. 2d 34, 36–38, 560 N.Y.S.2d 700 (1990), in which the Appellate Division of the New York Supreme Court held that a physician owes no duty to a plaintiff in the absence of a physician-patient relationship and that such a relationship does not arise within the con-

[7] We note that, in his complaint, the plaintiff alleged only that the defendants had failed to notify him of his abnormal EKG in a timely manner. According to the plaintiff, this claim sounds solely in negligence rather than in medical malpractice. We also note that, although the plaintiff asserted only one cause of action, both the plaintiff, in his opposition to the defendants' motion for summary judgment, and the trial court, in its memorandum of decision, addressed the issue of whether anyone employed by Mobile Medical, i.e., the attending physician or medical technicians, ever had treated or advised the plaintiff during the course of his examination. Accordingly, we address this issue on appeal even though the plaintiff did not raise such a claim in his complaint. The plaintiff contends, however, that, unlike the ordinary negligence claim that he raises in his complaint, any claim based on the alleged advice of an attending physician sounds solely in medical malpractice. We discuss the proper characterization of the plaintiff's claims later in this opinion.

text of a fitness for duty examination.[8] Thereafter, the trial court ultimately concluded that, based on the allegations in the complaint, the plaintiff's cause of action sounded solely in medical malpractice. Having determined that a conflict of laws analysis was unnecessary, the trial court applied the principles set forth in *Lee,* effectively rendering its decision on the basis of an application of New York medical malpractice law.

The trial court concluded that a physician-patient relationship did not exist between the plaintiff and Mobile Medical. In so concluding, the trial court explained that "no physician-patient relationship exist[s] when a physician is retained to examine a patient solely on behalf of an employer . . . ." The court recognized, however, that, in accordance with *Lee,* " '[a]n exception applies . . . where the physician affirmatively treats or affirmatively advises the employee as to treatment and the treatment actually causes further injury.' " The trial court then concluded that the exception did not apply in the present case because the statement of Keefe, the attending physician, to the plaintiff "[did] not rise to the level of affirmative treatment or advisement as to treatment as a matter of law." The court reasoned that "[Keefe's] statement [did] not contain any direction as to any medical treatment [that the plaintiff] should seek or forgo. . . . Indeed, the statement indicated to [the plaintiff] that he had one irregular heartbeat, but that everything else looked fine." In the trial court's view, "[i]t would not have been reasonably foreseeable, based on this statement alone, that [the plaintiff] would have forgone seeking medical care from his normal physicians." Accordingly, the trial

[8] The trial court cited to *Pokorny* v. *Shafer,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-93-0528375 (February 28, 1994) (11 Conn. L. Rptr. 151), and *Cowan* v. *Warner-Lambert Co.,* Superior Court, judicial district of Ansonia-Milford, Docket No. CV-90-032564 (July 28, 1993) (9 Conn. L. Rptr. 474), in support of its conclusion that Connecticut has adopted the holding in *Lee.*

court concluded that, in the absence of a physician-patient relationship, the defendants did not owe the plaintiff a duty of care and, consequently, the plaintiff's claim failed as a matter of law. The trial court thereupon granted the defendants' motion for summary judgment and rendered judgment in their favor.

On appeal,[9] the plaintiff challenges the trial court's decision on two grounds.[10] First, the plaintiff claims that, under the facts of this case and notwithstanding the holding in *Lee*, Mobile Medical had a duty to inform the plaintiff of his abnormal EKG. The plaintiff requests that we adopt a more expansive rule regarding the concept of "duty" than that announced in *Lee* and, accordingly, conclude that there existed a duty to notify the plaintiff about his abnormal EKG. Additionally, the plaintiff contends that, inasmuch as he brought his action against the defendants under a theory of negligence rather than medical malpractice, the decision in *Lee* should not control the outcome of this case because the holding in *Lee* was predicated on principles of medical malpractice rather than principles of negligence.

Second, the plaintiff claims that, even if we apply *Lee*, the trial court improperly concluded that Keefe's statement to the plaintiff concerning his EKG did not give rise to a duty of care as a matter of law. We conclude that, under New York law, Mobile Medical did not have a duty to inform the plaintiff of his abnormal EKG. We also conclude, however, that the trial court

[9] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[10] In addition to the two claims that we address in this opinion, the plaintiff, in his brief to this court, also raised the claim that the defendants were liable to the plaintiff on the basis of a contract between the plaintiff's employer and Mobile Medical. This claim, however, was not raised in the trial court and, accordingly, was not addressed in the trial court's decision. Therefore, we do not address this issue on appeal. See, e.g., *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996).

improperly determined that, as a matter of law, Keefe's statement to the plaintiff did not fall within the exception for affirmative treatment or advice, and, therefore, did not give rise to a duty of care. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

I

We begin by noting that, contrary to the conclusion of the trial court, this case does not present a "false conflict" whereby the controlling law of each jurisdiction is the same. The trial court concluded that Connecticut law is the same as New York law on the issue of whether a physical examination of an employee by a physician hired by an employer creates a physician-patient relationship that can serve as the basis for the recognition of a duty of care. The trial court reached this conclusion even though no appellate court in Connecticut ever has addressed this issue under these circumstances. Although we recognize the Superior Court cases on which the trial court relied, those cases cannot support the trial court's conclusion that Connecticut law is the same as New York law with respect to this issue. Consequently, because there is no controlling appellate court precedent in Connecticut, the trial court should have addressed the conflict of laws issue to determine which state's law to apply. See R. Leflar et al., American Conflicts Law (4th Ed. 1986) § 92, p. 272 (only determination of "false conflict," whereby application of law of either jurisdiction would produce same results, eliminates need for conflict of laws analysis).

We conclude, nonetheless, that we are constrained in this appeal to apply New York law. We reach this conclusion for the following reasons. First, the plaintiff has not presented this court with an adequate challenge to the trial court's decision effectively to apply New

York law, that is, the principles announced in *Lee*.[11] The trial court applied these principles throughout its analysis on the basis of its determination that Connecticut has adopted the principles of *Lee* with respect to medical malpractice claims. Although the plaintiff contends that *Lee* is not controlling, he does not challenge the trial court's conclusion that there is no conflict between New York and Connecticut law, nor does he address whether a conflict of laws analysis would favor application of Connecticut law should we conclude that a conflict exists between New York and Connecticut law. At oral argument before this court, the plaintiff argued that it was unnecessary to challenge the trial court's decision with respect to the conflict of laws issue in light of the fact that the plaintiff agreed with the trial court's decision to apply Connecticut law. This statement, however, reflects a fundamental misunderstanding of the trial court's decision. The trial court decided to apply Connecticut law, not on the basis of a conflict of laws analysis, but, rather, on the basis of its conclusion that Connecticut has adopted the decision in *Lee* and, therefore, that no conflict exists between New York and Connecticut law. Thus, the trial court applied " 'the law of the forum state, to the extent it is common to both [states],' " or, in other words, the decision in *Lee* in light of the fact that *Lee* has been adopted in Connecticut. Inasmuch as the plaintiff does not raise a conflict of laws issue on appeal, he is foreclosed from arguing that this court should apply a more expansive rule than that announced in *Lee*. In order for us to review such a claim, the plaintiff not only needed to

---

[11] We stress that our application of *Lee* in this appeal should not be construed as an endorsement of the trial court's conclusion that Connecticut has adopted the holding in that case. Rather, we apply the principles of *Lee* on the basis of our determination that neither party has raised an adequate challenge to the trial court's conclusion that no conflict exists between New York and Connecticut law. Furthermore, as we discuss later in this opinion, were we to engage in a conflict of laws analysis, New York law would prevail.

argue that there exists a conflict between New York and Connecticut law, but also that Connecticut law should apply under a conflict of laws analysis. Because the plaintiff has not raised either argument, we decline to consider whether Connecticut law in this area favors a more expansive rule than that announced in *Lee*.

We nevertheless address the conflict of laws issue in this case because this issue is a question of law that likely will recur upon remand, and we have sufficient information upon which to base such a determination.[12] Cf. *Schroeder* v. *Triangulum Associates*, 259 Conn. 325, 327, 789 A.2d 459 (2002) (after ordering new trial on basis of dispositive issue, addressing additional issues likely to arise at retrial). Our analysis leads to the conclusion that New York law should apply under the facts of this case.

In deciding conflict of laws issues, we are guided by the principles set forth in our previous decision in *O'Connor* v. *O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986). In *O'Connor*, we recognized that "[t]his court has traditionally adhered to the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, or lex loci delicti." Id., 637. Under the facts of *O'Connor*, however, "we expressly abandoned categorical allegiance to the doctrine of lex loci delicti in tort actions. *O'Connor* . . . involved an action by the passenger of an automobile against the driver for injuries arising out of an automobile accident. Both parties were Connecticut domiciliaries but the accident occurred in Quebec, Canada. The principal issue was whether to apply the law of Quebec, which barred the plaintiff's action, or the law of Connecticut, which permitted it. The trial

---

[12] Although neither party briefed the conflict of laws issue on appeal, both parties addressed the issue in motions filed with the trial court, and, thus, the record before us is sufficient to resolve this issue.

court [in *O'Connor*] applied the doctrine of lex loci delicti and granted the defendant's motion to strike the plaintiff's complaint. On appeal, we substituted the most significant relationship analysis of §§ 6 and 145 of the Restatement [(Second) of Conflict of Laws] . . . for the doctrine of lex loci delicti. . . . After considering the Restatement [Second] factors, we concluded that Connecticut had the closest relationship and the greatest interest in the disposition of the case. We therefore applied the law of Connecticut." (Citations omitted; internal quotation marks omitted.) *Williams* v. *State Farm Mutual Automobile Ins. Co.*, 229 Conn. 359, 371–72, 641 A.2d 783 (1994).

Subsection (1) of § 145 of the Restatement (Second) of Conflict of Laws provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." 1 Restatement (Second), Conflict of Laws § 145 (1), p. 414 (1971). Subsection (2) of § 6 of the Restatement (Second) of Conflict of Laws, in turn, provides: "When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations,(e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Id., § 6 (2), p. 10.

"For assistance in our evaluation of the policy choices set out in §§ 145 (1) and 6 (2) [of the Restatement (Second)], we turn . . . to § 145 (2) . . . which establishes black-letter rules of priority to facilitate the appli-

cation of the principles of § 6 to tort cases." *O'Connor v. O'Connor*, supra, 201 Conn. 652. Subsection (2) of § 145 of the Restatement (Second) of Conflict of Laws provides: "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue." 1 Restatement (Second), supra, § 145 (2), p. 414.

In support of his contention in the trial court that Connecticut law should apply, the plaintiff offered the following reasons: (1) the plaintiff is a domiciliary of Connecticut; (2) Mobile Medical is incorporated in Connecticut; (3) Mobile Medical analyzed the test results in Connecticut; (4) the plaintiff suffered his heart attack at his home in Connecticut; and (5) the plaintiff incurred medical expenses in Connecticut and has and will continue to seek medical treatment in Connecticut. The defendants offered the following reasons for the application of New York law: (1) the plaintiff was employed in New York; (2) the physical examination of the plaintiff was administered in New York; (3) the contract pursuant to which Mobile Medical administered the physical examination of the plaintiff was negotiated, entered into and substantially performed in New York; (4) the employees examined pursuant to the contract were all employees of a fire department located in New York; (5) New York had expressed an interest in this area of law on the basis of its case law, whereas Connecticut has yet to address this particular issue; and (6) inasmuch as a New York appellate court has addressed this particular issue, it would be substantially

easier to determine and apply its law. We agree with the defendants that New York law should apply in light of the factors set forth in § 145 (2) of the Restatement (Second) of Conflict of Laws.

We now analyze the relevant Restatement (Second) factors in the context of the facts of the present case. We begin by considering the specific contacts of each jurisdiction to the present controversy, which, under § 145 (2), are factors to be considered in determining the applicable law under § 6. Inasmuch as the plaintiff in the present case is a domiciliary of Connecticut and suffered his injury in Connecticut, and Mobile Medical is incorporated in Connecticut, factors (a) and (c) of § 145 (2) weigh in favor of applying Connecticut law. Factors (b) and (d), however, favor application of New York law. Specifically, it was the statement made by Keefe, the attending physician, that allegedly led the plaintiff to forgo further medical treatment, which, in turn, allegedly led to his heart attack. Thus, the primary injury causing conduct occurred in New York. See id., § 145 (2) (b), p. 414. Moreover, the relationship between the parties, which was based solely on Mobile Medical's administration of the plaintiff's fitness for duty examination, was centered in New York. See id., § 145 (2) (d), p. 414. Therefore, because the injury causing conduct occurred in New York, and because the relationship between the parties was centered in New York, § 145 (2) (b) and (d) favors application of New York law. As *O'Connor* informs us, "it is the significance, and not the number, of § 145 (2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach. As the concluding sentence of § 145 (2) provides, '[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue.' " *O'Connor* v. *O'Connor*, supra, 201 Conn. 652–53, quoting 1 Restatement (Second), supra, § 145 (2), p. 414.

Upon evaluating the relative importance of each factor, we conclude that New York has the greater contact with the parties in this case. In our view, the most significant factor is that Mobile Medical administered fitness for duty examinations to the plaintiff and other employees of a New York fire department. Any duty of care that Mobile Medical may have owed to the plaintiff derived from Mobile Medical's examination of the plaintiff to determine whether he could meet the physical demands associated with his position as an interior attack firefighter with a New York fire department. Moreover, the primary issue in this case is whether a medical services provider owes a duty of care to an employee whose employer contracts with that provider to perform fitness for duty examinations of its employees. Thus, although the plaintiff's domicile is a relevant factor, we believe that his status as a New York firefighter is more significant under the circumstances. More importantly, there is a strong and direct relationship between any duty of care that we may recognize in this case and Mobile Medical's performance of the fitness for duty examination of the plaintiff, which occurred in New York. Although we acknowledge that Connecticut's relationship to the present controversy might not be as fortuitous as Quebec's relationship to the controversy in *O'Connor*; see *O'Connor* v. *O'Connor*, supra, 201 Conn. 645–46 ("application of the lex loci delicti doctrine [in *O'Connor* would have made] determination of the governing law turn upon a purely fortuitous circumstance: the geographical location of the parties' automobile [when] the accident occurred"); the fact that the plaintiff is a Connecticut domiciliary and that he suffered his heart attack in Connecticut are circumstances that are merely incidental to the present controversy. Indeed, the plaintiff's status as an employee of a New York fire department and the fact that the fitness for duty examination occurred in New

York are the more significant and relevant considerations in determining whether to apply Connecticut law or New York law. Furthermore, it is undisputed that the plaintiff's employer had given the plaintiff the option of having his examination administered by a health care provider of his choosing, but that he had opted to have it administered by Mobile Medical.

In applying the factors enumerated in subsection (2) of § 6 of the Restatement (Second) of Conflict of Laws, we cannot discern any compelling reason to apply Connecticut law rather than New York law. In determining which state's law to apply under § 6 (2) of the Restatement (Second), we must review, inter alia, the respective policies and interests of both New York and Connecticut as to whether medical service providers that are hired by an employer to perform fitness for duty examinations of the employer's employees owe a duty to those employees. First, we recognize that no Connecticut appellate court has addressed the issue of whether a medical services provider owes a duty of care to an employee under these circumstances. Thus, neither this court nor the Appellate Court has yet to express our state's policy interest regarding this issue of law. Even if we assume, arguendo, that this court would be inclined to follow a more expansive rule than that announced in *Lee*, and to ascribe to a policy that differs from New York's policy with respect to a medical service provider's duty of care under these circumstances, that inclination would not tip the scales in favor of applying Connecticut law in this case. With respect to this point, we note that New York has expressed an interest, by virtue of its decision in *Lee*, in placing reasonable and practical limitations on legally cognizable duties owed by medical service providers under circumstances such as those presented in this case. See *Lee* v. *New York*, supra, 162 App. Div. 2d 36–38; see also *Murphy* v. *Blum*, 160 App. Div. 2d 914,

915, 554 N.Y.S.2d 640 (1990) (physician hired to perform fitness for duty examination of employee owed no duty of care to employee). Thus, even if we assume that Connecticut has an interest in recognizing a duty of care under the circumstances of this case, we cannot conclude that such an interest outweighs New York's interest in having its law applied. Moreover, New York has established a bright-line rule that specifically addresses the precise issue in this case, thereby facilitating the application of its law. See 1 Restatement (Second), supra, § 6 (2) (g), p. 10. Although we previously have not afforded this consideration substantial weight; see *O'Connor* v. *O'Connor*, supra, 201 Conn. 651–52, citing 1 Restatement (Second), supra, § 6, comment (j), p. 16 (factor in § 6 [2] [g] "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results"); it nonetheless is a factor that, in a close case such as the one before us, should be considered. Finally, § 6 (2) (d) instructs us to consider whether the parties have any justified expectations that warrant protection through the application of a certain state's law. In this regard, we have stated that the protection of the parties' justified expectations is of particular importance when dealing with contracts. See *Interface Flooring Systems, Inc.* v. *Aetna Casualty & Surety Co.*, 261 Conn. 601, 612, 804 A.2d 201 (2002), citing 1 Restatement (Second), supra, § 188, comment (b), p. 576. As Mobile Medical notes, it negotiated and executed the contract to provide fitness for duty examinations in New York. Additionally, Mobile Medical examined the plaintiff in New York and, therefore, the contract was performed in New York. Thus, the expectation factor heavily favors application of New York law. See *Interface Flooring Systems, Inc.* v. *Aetna Casualty & Surety Co.*, supra, 610 (when contract was entered into and performed in Georgia, presumption arises that Georgia law applies).

Therefore, on the basis of the foregoing, including our determination that New York has greater contacts with the parties to this controversy and our determination that neither state's interests or policy considerations outweigh each other, we conclude that New York law applies.

## II

We now analyze the issues raised on appeal under New York law. We first set forth the applicable standard of review.[13] "[T]he determination of whether a duty exists between individuals is a question of law. . . . Only if a duty is found to exist does the trier of fact go on to determine whether the defendant has violated that duty. . . . When the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 571, 717 A.2d 215 (1998).

We continue our analysis by determining whether, under New York law, the plaintiff's claim that Mobile Medical owed him a duty of care is one of ordinary negligence or whether it sounds solely in medical malpractice.[14] On the basis of our review of New York law,

---

[13] We note that our decision regarding what state's law to apply only concerns the application of substantive law, and, thus, we follow the law of Connecticut on procedural issues such as the appropriate standard of appellate review.

[14] The distinction between a medical malpractice claim and ordinary negligence claim is significant in this case in light of the fact that the decision in *Lee* was based on principles of medical malpractice. Were we to conclude that the plaintiff's complaint properly is characterized as one asserting an ordinary negligence claim, the plaintiff would be correct in his assertion that *Lee* is not controlling and, therefore, we would have to look beyond that case to determine the extent of the defendant's duty under the present facts. Because we agree with the trial court that the plaintiff's claim is one sounding in medical malpractice, however, we need only apply the principles announced in *Lee*.

as well as the allegations in the plaintiff's complaint,[15] we conclude that the plaintiff's claim that Mobile Medical owed him a duty to inform him of his abnormal EKG sounds solely in medical malpractice. The New York Court of Appeals has concluded that "a claim sounds in medical malpractice when the challenged conduct constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician . . . ." (Internal quotation marks omitted.) *Weiner* v. *Lenox Hill Hospital*, 88 N.Y.2d 784, 788, 673 N.E.2d 914, 650 N.Y.S.2d 629 (1996). "The distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two . . . ." (Internal quotation marks omitted.) Id., 787. When the challenged conduct forms an integral part of the medical treatment process, however, the claim properly is characterized as one sounding in medical malpractice rather than ordinary negligence. E.g., *Scott* v. *Uljanov*, 74 N.Y.2d 673, 675, 541 N.E.2d

---

[15] In his substitute complaint, the plaintiff alleged in relevant part:

"6. [The plaintiff's] heart attack occurred as the result of the carelessness and negligence of the defendant[s] . . . in that they:

"(a) knew or should have known that the [EKG] performed upon the plaintiff . . . on September 11, 1995, was abnormal and reflective of cardiovascular difficulty, yet failed to notify the plaintiff of said test results until November 8, 1995.

"(b) knew or should have known that the plaintiff . . . as the result of his employment as a professional firefighter, was subjected to extreme physical and emotional stress which when combined with a known cardiovascular abnormality, placed him at extremely high physical risk, yet failed to warn him of this risk until November 8, 1995.

"(c) knew or should have known that said test results required the plaintiff . . . to immediately follow up with a cardiologist or cardiovascular physician in order to take the proper preventive medicine precautions to avoid more serious medical complications, yet failed to notify him of said test results until November 8, 1995.

"(d) failed to exercise that degree of care and skill customarily engaged in by medical testing personnel by failing to notify the plaintiff . . . of the abnormal nature of the [EKG] performed upon him until nearly sixty days after said examination."

398, 543 N.Y.S.2d 369 (1989); *Twitchell* v. *MacKay*, 78 App. Div. 2d 125, 128–29, 434 N.Y.S.2d 516 (1980).

The New York Court of Appeals clarified the distinction between the two causes of action in *Bleiler* v. *Bodnar*, 65 N.Y.2d 65, 479 N.E.2d 230, 489 N.Y.S.2d 885 (1985). In *Bleiler*, the plaintiff, James Bleiler, arrived at the emergency room of the defendant hospital seeking treatment for an eye injury. Id., 66. Upon arrival, a nurse obtained Bleiler's medical history, after which a physician examined and treated Bleiler. Id. Ultimately, however, the physician failed to detect a foreign object that was lodged in Bleiler's right eye. Id. Consequently, Bleiler suffered a permanent loss of vision in that eye. Id., 67.

Bleiler filed an action in which he asserted several claims. Id. Specifically, Bleiler alleged that the hospital, physician and nurse were negligent in administering medical care to him, and that the hospital was negligent in failing to provide competent personnel and in promulgating certain emergency care protocol. Id. On appeal, the New York Court of Appeals was called upon to determine whether Bleiler's claims sounded in ordinary negligence or in medical malpractice in order to identify the appropriate statute of limitations to apply to those claims. Id. The court explained that Bleiler's claims that the physician and nurse each were negligent in failing to take proper medical histories and that the physician was negligent in performing his examination of Bleiler could only be characterized as medical malpractice claims in light of the fact that the challenged conduct was "a crucial element of diagnosis and treatment." Id., 72. The court also noted that claims of negligent medical care are not limited to physicians, and can be asserted against other health care providers, such as nurses, who provide similar treatment, or even against a hospital, either directly or on the basis of vicarious liability for the acts of its employees. Id., 69, 71–72. On the other

hand, the court recognized that when a claim is based on a hospital's negligent selection of staff or a failure to adopt and prescribe proper procedures and regulations, "the requisite elements [are] markedly different from a malpractice cause of action." Id., 73. Thus, these types of claims sound in ordinary negligence; "[i]n both instances, the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty." Id.

Additionally, the New York Court of Appeals held in *Scott* v. *Uljanov*, supra, 74 N.Y.2d 673, that a claim "challeng[ing] [a] hospital's assessment of the supervisory and treatment needs of [a] highly intoxicated patient during his initial emergency room care"; id., 675; sounded in medical malpractice. Id. In *Scott*, the plaintiff, Thomas Scott, arrived at the hospital in a highly intoxicated state and was placed in a hospital bed with the side rails placed in the upright position for his safety. Id., 674. Subsequently, Scott climbed out of the end of the bed, fell and suffered a head injury. Id. Scott brought an action against the hospital for negligent supervision. Id. The trial court dismissed the action on the ground that it was barred by the statute of limitations governing medical malpractice claims. Id. On appeal, the New York Court of Appeals restricted its analysis to whether the claim sounded in negligence or medical malpractice. See id., 674–75. The court concluded that, on the basis on its decision in *Bleiler*, the claim must be characterized as one for medical malpractice in light of the fact that "the conduct at issue constituted an integral part of the process of rendering medical treatment to [Scott]." Id., 675.

In the present case, the plaintiff contends that his claim sounds in ordinary negligence inasmuch as the defendants were not sued as treating physicians but, rather, as a corporation and its president. The plaintiff further contends that he did not allege negligence in

the rendering of medical treatment but, rather, negligence in Mobile Medical's failure to inform him of his abnormal EKG.

We are unpersuaded, however, that the plaintiff's allegations do not constitute a medical malpractice claim. Even if we were to accept the plaintiff's contention that the defendants were sued in their capacities as a medical services company and its president, rather than as physicians, this, in and of itself, does not preclude the plaintiff's claim from being characterized as one sounding strictly in medical malpractice. See *Bleiler* v. *Bodnar*, supra, 65 N.Y.2d 69, 70 (recognizing that medical malpractice claims may be brought against hospital, either directly or indirectly through actions of its employees). The plaintiff offers no support for his contention that medical malpractice claims can be asserted only against physicians, and it is clear that Mobile Medical was acting as a medical service provider in rendering the type of services involved in this case. Moreover, the crux of the complaint concerns Mobile Medical's medical diagnosis of a life threatening condition and its subsequent failure to notify. In view of the fact that such diagnosis is substantially related to medical treatment and, therefore, "constitute[s] an integral part of the process of rendering medical treatment"; *Scott* v. *Uljanov*, supra, 74 N.Y.2d 675; and, because the disclosure of a medical condition, or failure thereof, involves the exercise of medical judgment, the plaintiff's claim properly is characterized as one sounding in medical malpractice. Accordingly, because the plaintiff's complaint sounds solely in medical malpractice and involves facts bringing it directly within the holding of *Lee,* we analyze the facts of the present case under the principles announced in *Lee.*

In *Lee,* Henry Young, a physician hired by the fire department of the city of New York, performed a fitness for duty examination on the decedent, Joseph J. Lee,

a fireman, as part of the department's preemployment screening process. *Lee* v. *New York*, supra, 162 App. Div. 2d 35. On the basis of this examination, which included an EKG, Young determined that Lee was qualified for duty. Id. Soon thereafter, Lee died as a result of arteriosclerosis of his right coronary artery and enlargement of his heart. Id. The plaintiff, the administrator of Lee's estate, brought a wrongful death action against the city of New York (city) and Young, alleging medical malpractice as a result of Young's failure to diagnose Lee's medical ailments. Id.

The city and Young filed a motion for summary judgment, claiming that, because there was no physician-patient relationship between Young and Lee, the plaintiff could not successfully maintain a medical malpractice action. Id. The trial court denied that motion; id.; but was reversed on appeal. Id., 39. In reversing the trial court's order denying the motion for summary judgment, the Appellate Division explained: "Generally, recovery for a physician's malpractice is predicated upon the existence of a physician-patient relationship . . . . The physician-patient relationship does not exist if the physician is retained solely to examine an employee on behalf of an employer . . . . An exception applies, however, when the physician affirmatively treats or affirmatively advises the employee as to treatment and the treatment actually causes further injury." (Citations omitted.) Id., 36.

The Appellate Division then made the following conclusions: (1) Lee had submitted to the fitness for duty examination as part of the New York fire department's eligibility criteria; (2) Young had performed the examination solely for the purpose of determining Lee's fitness for duty as a firefighter; and (3) Young did not affirmatively treat or advise Lee as to a course of treatment. Id., 37–38. On the basis of these conclusions, the Appellate Division held that no physician-patient

relationship existed between Young and Lee. Id., 38. Accordingly, the Appellate Division reversed the trial court's order and granted the motion for summary judgment filed by Young and the city. Id., 39.

We agree with the trial court in the present case that, under the principles announced in *Lee*, Mobile Medical does not owe a duty of care to the plaintiff in the absence of any treatment or advice on the part of Mobile Medical personnel. In *Lee*, the Appellate Division concluded that when a "physician is employed or retained by a third party to conduct an examination for the benefit of the third party, there must be something more than a mere examination in order to find a physician-patient relationship . . . . There must be some showing that the physician affirmatively treated the patient or affirmatively advised him to be treated." (Citations omitted.) Id., 37. When a physician or other medical services provider performs a fitness for duty examination, but otherwise remains silent, there is no affirmative action upon which to base a finding of a duty. Id. Thus, in the absence of any treatment or advice on the part of Mobile Medical or its personnel, a physician-patient relationship could not have existed between the plaintiff and Mobile Medical such that Mobile Medical would have owed the plaintiff a duty of care.

We next consider the exception that the Appellate Division recognized in *Lee* for affirmative treatment or advice. On the basis of this exception, we reject the trial court's conclusion that, as a matter of law, Keefe's statement to the plaintiff in this case did not constitute treatment or advice and, therefore, did not give rise to a duty of care. In the present case, Mobile Medical personnel administered a physical examination of the plaintiff for the purpose of determining his fitness for duty as an interior attack firefighter. The examination consisted of several tests, including an EKG, which were performed at a local testing site, under the supervi-

sion of Keefe, the attending physician employed by Mobile Medical. Keefe allegedly was aware of the physical and emotional demands associated with the plaintiff's particular job. As we previously have noted, during the course of the plaintiff's examination, following administration of the EKG, the plaintiff asked Keefe about his EKG. Keefe told the plaintiff: "Everything looks fine. We only found one irregular heartbeat." The plaintiff allegedly relied on Keefe's statement in deciding to forgo further treatment or consultation and subsequently suffered a heart attack.

The trial court concluded that Keefe's statement "indicated to [the plaintiff] that he had one irregular heartbeat, but that everything else looked fine." The court concluded further that, as a matter of law, it was not "reasonably foresee[able]" that "[the plaintiff] would rely on [this] statement . . . and otherwise not seek treatment."

The defendants argue that there is no appreciable difference between Keefe's actual statement and the trial court's characterization of that statement, and that they are two different ways of saying the same thing. On the other hand, the plaintiff argues that Keefe's actual statement "implies that one irregular heartbeat is not an indication of there being anything clinically wrong or abnormal," whereas, the trial court's characterization of Keefe's statement "would indicate that the irregular heartbeat was not fine . . . [but] that everything else was fine."

Viewing the evidence in the light most favorable to the plaintiff, as we are required to do in determining the propriety of a ruling on a defendant's motion for summary judgment, we cannot reject the plaintiff's interpretation of Keefe's actual statement. We conclude that, in light of the nature of the services performed, as well as the totality of the circumstances of this case,

the plaintiff's interpretation of Keefe's statement certainly is a fair and reasonable one.

Therefore, we conclude that the trial court's decision is inconsistent with the proper standards governing rulings on motions for summary judgment. We have held that summary judgment "is appropriate only if a fair and reasonable person could conclude only one way." *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 751, 660 A.2d 810 (1995); see also *Haesche* v. *Kissner*, 229 Conn. 213, 216–17, 640 A.2d 89 (1994). To succeed on a motion for summary judgment, "[t]he movant must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . [A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party. . . . [A] directed verdict may be rendered only where, on the evidence *viewed in the light most favorable to the nonmovant*, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, supra, 751–52.

In granting the defendants' motion for summary judgment, the trial court necessarily concluded that a fair and reasonable person, under the present facts, could not have concluded that Keefe's statement to the plaintiff constituted treatment or advice. We disagree. Accordingly, because there exists an issue of material fact as to whether Keefe's statement concerning the plaintiff's EKG constituted treatment or advice, the resolution of which may lead to a finding of a duty of care, we conclude that the trial court improperly granted the defendants' motion for summary judgment.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.