■ ARTHUR H. STEVENS, Appellant, v PUBLICIS S.A., et al., Respondents. [854 NYS2d 690]—

Judgment, Supreme Court, New York County (Richard B. Lowe, III, J.), entered February 26, 2007, dismissing the complaint in its entirety after a jury trial, unanimously affirmed, with costs. Order, same court and Justice, entered January 12, 2007, which granted defendants' motion for partial summary judgment on their claim for reasonable attorneys' fees and expenses, unanimously affirmed, with costs.

In October 1999, plaintiff sold his New York-based public relations firm, Lobsenz-Stevens (L-S), to defendant Publicis S.A., a French global communications company, and its codefendant American subsidiary. The sale involved two contracts: a stock purchase agreement, pursuant to which plaintiff sold all the stock of L-S to defendants, and an employment agreement, pursuant to which plaintiff was to continue as chairman and CEO of the new company, named Publicis-Dialog, Public Relations, New York (PDNY), for three years. Plaintiff's duties were to be the "customary duties of a Chief Executive Officer."

Under the stock purchase agreement (SPA), plaintiff received an initial payment of $3,044,000, and stood to earn "earn-out" payments of up to $4 million contingent upon PDNY achieving certain levels of earnings before interest and taxes during the three calendar years after closing.

Within six months of the acquisition, signs of financial problems appeared. Plaintiff admits that revenue and profit targets were not met. Further, PDNY lost L-S's largest preacquisition client, Pitney Bowes. On March 5, 2001, plaintiff had a meeting with Jon Johnson, former CEO of Publicis Dialog, a related entity, at which he was shown financial statements and told that the business had lost approximately $900,000 in the year 2000. Plaintiff was removed as CEO of the business, and was given several options, including leaving the firm, staying and working on new business, and a third option to come up with another alternative. Thereafter, Bob Bloom, former chairman and CEO of Publicis USA, became involved in the matter. Bloom and plaintiff exchanged a series of e-mails, culminating in a March 28 message from Bloom setting forth his understanding of the parties' terms regarding plaintiff's new role at PDNY: "Thus I suggested an allocation of your time that would permit the majority of your effort to go against new business development (70%). I also suggested that the remaining time be al-

located to maintaining/growing the former Lobsenz Stevens clients (20%) and involvement in management/operations of the unit (10%). *This option, it would seem, is in your best interest because it offers the best opportunity for you to achieve your stated goal of a full earn-out.* When I suggested this option, you seemed to have considerable enthusiasm for it and expressed your satisfaction with it so I, of course, assumed that it was an option you preferred." (Emphasis added.) By e-mail the next day, plaintiff wrote:

"Bob, to begin with, I want to thank you again for helping me restore the dignity and respect that I'm entitled to as a senior professional. Things were really getting out of hand until you intervened.

"What's happened since the lunch you and I had has been almost cathartic . . .

*"That being said, I accept your proposal with total enthusiasm and excitement* . . .

"I'm psyched again and will do everything in my power to generate business, maintain profits, work well with others and move forward." (Emphasis added.)

Bloom replied the same day: "I am thrilled with your decision. You have my personal assurance that all of us will continue to work in the spirit of partnership to achieve our mutual goal and function together as close senior collaborators in a climate of respect and dignity for all." Each of the e-mail transmissions bore the typed name of the sender at the foot of the message.

In denying plaintiff's motion for partial summary judgment prior to trial, the court found that the parties had agreed in writing to modify plaintiff's duties under the employment agreement. In so ruling, the court properly relied on the e-mail exchange between the parties in which both sides expressed their unqualified acceptance of the modification to the agreement.

The series of e-mails beginning with Bloom's March 26, 2001 message setting forth the terms of the proposed modification, together with plaintiff's March 29 acceptance of the terms of the agreement and Bloom's immediate reply, memorialized the terms of the parties' agreement to change plaintiff's responsibilities under the employment agreement. The agreement is further confirmed in another e-mail sent to Andrew Hopson, chief operating officer of PDNY, in which plaintiff reaffirmed his unconditional acceptance of the modified agreement.

The e-mails from plaintiff constitute "signed writings" within the meaning of the statute of frauds, since plaintiff's name at

the end of his e-mail signified his intent to authenticate the contents (*see Rosenfeld v Zerneck*, 4 Misc 3d 193 [2004]). Similarly, Bloom's name at the end of his e-mail constituted a "signed writing" and satisfied the requirement of section 13 (d) of the employment agreement that any modification be signed by all parties.

The trial court's instruction regarding the covenant of good faith and fair dealing was proper. In *Pernet v Peabody Eng'g Corp.* (20 AD2d 781, 782 [1964]), we stated that a breach of the covenant depends upon a finding that the defendant acted with intent to deprive the plaintiff of his rights under the agreement to which the defendant was a party, "or, if the same was brought about by conduct of the defendant in such reckless or neglectful disregard of plaintiff's contract rights as to justify an inference of bad faith." The Restatement, which sets forth the same formulation of the implied covenant, indicates that "bad faith" may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" (Restatement [Second] of Contracts § 205, Comment *d*). This is the very conduct alleged in the complaint. Therefore, the use of the term "bad faith" in describing the conduct necessary to find a breach of the covenant was not improper.

The court properly declined plaintiff's request to offer rebuttal testimony, since plaintiff had testified on these topics at length during his direct case. There was no error in instructing the jury, during a read-back of Johnson's testimony, that the "breach" to which Johnson referred was a breach of the employment agreement and not the stock purchase agreement. The instruction was proper. In March 2001, when the conversation occurred, breach of the SPA was not yet an issue since plaintiff at that point did not know whether he would be entitled to any earn-out payments. As of that point in time, no earn-out calculations had been performed for 2000 and 2001, and it was not yet 2002. Furthermore, as the court noted, the employment agreement, not the SPA, contains the relevant provisions concerning plaintiff's position and job duties.

The jury's verdict was based on a fair interpretation of the evidence, and was not against the weight of the evidence. Attorneys' fees were properly awarded pursuant to section 13 (h) of the employment agreement since breach of that agreement was at issue during the trial, and the claim was only removed from the case prior to its submission to the jury. However, since the claim was admittedly removed from the case as of that point

in time, any award of attorneys' fees should exclude fees in connection with preparation of post-trial memoranda. Concur—Lippman, P.J., Tom, Williams and Acosta, JJ.