**SSP CAPITAL PARTNERS, LLC, Plaintiff,**

v.

**MANDALA, LLC, Haroust, LLC, Hamilton Grange, LLC, Arabara, LLC, & 316 Second Avenue, LLC, Defendants.**

No. 07 Civ. 3878(NRB).

United States District Court, S.D. New York.

Dec. 29, 2009.

Richard C. Yeskoo, Esq., Yeskoo Hogan & Tamlyn, LLP, New York, NY, for Plaintiff.

Michael T. Sucher, Esq., Brooklyn, NY, for Defendants.

## MEMORANDUM & ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff SSP Capital Partners LLC (plaintiff or "SSP") brings this action for breach of a loan commitment agreement, pursuant to this Court's diversity jurisdiction, against defendants Mandala, LLC, Haroust, LLC, Hamilton Grange, LLC, Arabara, LLC, and 316 Second Avenue, LLC, (collectively, "defendants"). Pending before the Court is defendants' motion for summary judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, defendants' motion is granted.

## BACKGROUND [1]

Plaintiff is a Maryland company engaged in the business of real estate investment and lending, through its two principals, Richard Grodsky and Michael Gordon, who reside in Maryland. Defendants are New York real estate holding companies, which own a number of properties in Manhattan. Defendants are controlled and managed by their principal, Haroutiun Derderian; his wife, Ekaterina Tsintadze Derderian, is the "sole member"

---

1. Unless otherwise noted, the following facts, which are derived principally from the Local Rule 56.1 statements of uncontested material facts of defendants ("DSF") and plaintiff ("PSF"), and the affidavits and exhibits attached thereto ("Derderian Aff."; "Gordon Aff."; "Yeskoo Aff."), are undisputed.

of the defendant entities. (*See* Derderian Aff., Exs. A–C.) In 2006, a number of mortgages on defendants' properties were in default, with some of the properties in foreclosure. Later that year, when defendants needed money to refinance the outstanding loans relating to certain of these properties, Derderian met with Gordon to begin negotiating a loan from plaintiff, secured by defendants' real property. (DSF ¶¶ 1–5.)

Following the parties' initial discussions, plaintiff prepared and transmitted to Derderian two or more drafts of proposed loan commitment letters, each draft being revised, *inter alia*, to increase the amount of the proposed loan as well as certain fees. (*See* DSF ¶¶ 5–7, 12, Derderian Aff., Exs. A–C.) Gordon signed a December 5, 2006 loan commitment letter for a loan of $550,000 and transmitted that letter to Derderian. Derderian did not sign the December 5 letter. (DSF ¶ 6; *see* Derderian Aff., Ex. A.)

Later in December, Derderian received a revised form of loan commitment, dated December 21, 2006, for an $800,000 loan. Although Gordon's name remained in the closing of the December 21 letter (hereinafter, the "Original Commitment Letter"), neither Gordon nor any representative of plaintiff signed it. (DSF ¶ 8; *see* Derderian Aff., Ex. B.) The Original Commitment Letter contained the following provision regarding a "Borrower Deposit":

> $10,000 to be paid upon acceptance of this commitment. In addition to the $10,000 deposit provided for in this paragraph, Borrower [i.e., defendants] shall advance as an additional deposit any retainer or additional retainer requested by counsel for lender in respect of its representation of Lender in connection with this loan transaction. Such advance of a retainer or additional retainer shall be made within 1 business day of receiving a written request for such retainer or additional retainer. This deposit and additional deposit shall be applied to Borrower's obligation to pay all costs to Lender [i.e., SSP] associated with this transaction or to Borrower's obligations at Loan Closing, or in the event Borrower fails to close as required by this Commitment after acceptance of the Commitment by Borrower, this deposit shall be forfeited to Lender. Such forfeiture shall not limit Lender's remedies in the event of Borrower's default hereunder.

(Derderian Aff., Ex. B.) In addition, the closing paragraphs of the Original Commitment Letter stated:

> Please indicate your acceptance of this Commitment by signing below and returning this letter along with your check in the amount of $10,000 payable to SSP Capital Partners, LLC no later than 5pm December 21, 2006. . . .

> If we have not received your signed acceptance of this commitment and deposit check by 5pm on December 21, 2006, time being of the essence, this Commitment shall expire and be of no force and effect.

(*Id.*) Derderian, on behalf of defendants, signed the Original Commitment Letter as "accepted" and sent a $10,000 deposit to plaintiff in connection with that letter. (DSF ¶ 9.) No closing ever occurred on the Original Commitment Letter. (*Id.* ¶ 11.)

Plaintiff retained defendants' $10,000 deposit, (*id.* ¶ 10), and, when it became apparent during due diligence that defendants needed more capital than contemplated in the initial documents, the parties' representatives discussed increasing the loan amount. After midnight on February 23, 2007, Gordon emailed Derderian an amended loan commitment letter, dated February 22, 2007 (the "Commitment Letter"), which was revised to include, *inter*

*alia*, a loan amount of $2,200,000. (*Id.* ¶¶ 12–13; Gordon Aff., Exs. 2–3.) The first sentence of the Commitment Letter provides:

> Subject to the terms and conditions of this letter, we [i.e., SSP] have amended and restated the loan commitment letter dated December 21, 2006 (the "Original Commitment Letter"), and agreed to make a loan secured by Mortgages and Pledges on [certain] . . . real property and ownership interests . . . [of defendants].

(Gordon Aff., Ex. 3.)

The Commitment Letter provided for a loan origination fee of $132,000 to be paid at loan closing, (*id.*), and included a Borrower Deposit provision, which, although otherwise identical to the parallel provision in the Original Commitment Letter, was revised in relevant part to provide the following:

> $10,000 *which was paid upon acceptance of the Original Loan Commitment* [sic] In addition to the $10,000 deposit provided for in this paragraph, Borrower shall advance as an additional deposit any retainer or additional retainer requested by counsel for lender in respect of its representation of Lender in connection with this loan transaction . . . .

(*Id.*) (emphasis added). The Commitment Letter also contained the following "Costs" provision:

> All costs to Lender in respect of the Original Loan Commitment and all costs associated with this transaction including, without limitation, Lender's legal expenses, will be paid by the Borrower, whether or not the loan transaction contemplated hereunder closes or not [sic].

2. The typewritten notation providing for the "accepted" date was "this ___ day of December, 2006," but was corrected by hand to

(*Id.*) The Commitment Letter closed with the following:

> Please indicate your acceptance of this Commitment by signing below and returning this letter by fax no later than 5pm February 23, 2007 . . . .

> If we have not received your signed acceptance of this commitment and deposit check by 5pm on February 23, 2007, time being of the essence, this Commitment shall expire and be of no force and effect.

(*Id.*) Derderian signed the Commitment Letter as "[a]ccepted," on February 23, 2007,[2] (DSF ¶ 13.), but never sent any deposit check other than the $10,000 which he had already transmitted to plaintiff in connection with the Original Commitment Letter and which plaintiff still held, (*id.* ¶ 15). No representative of plaintiff ever signed the Commitment Letter by hand. (*See id.* ¶ 13; Derderian Aff., Ex. C.)

The parties dispute certain facts regarding the circumstances after Derderian signed the Commitment Letter. Defendants assert that, within a few days of February 22, 2007, Gordon called Derderian to demand payment of an additional $10,000 deposit, which Derderian refused. (Derderian Aff. ¶ 23.) Plaintiff maintains that, since SSP was not asked for a retainer by its counsel, it never requested any additional deposit either in writing, as required by the Borrower Deposit provision, or orally. (Gordon Aff. ¶ 8.) In addition, plaintiff contends that neither Gordon nor any other representative of plaintiff ever asked for an additional $10,000 deposit and that Derderian never requested return of the initial deposit. (*Id.* ¶¶ 8–9.)

Between February 22 and early March, 2007, communication among the parties'

reflect the signature date of February 23, 2007.

representatives continued in preparation for and anticipation of a closing date. (*Id.* ¶¶ 8–10.) On February 22, 2007, Gordon sent an email to encourage a mortgagee of one of defendants' properties to postpone its foreclosure sale, scheduled for March 1, 2007, because SSP anticipated closing its loan agreement with defendants in the week of February 26, 2007. (*Id.* ¶ 12, Ex. 5.) That target date apparently shifted, since, on March 6, 2007, Grodsky emailed Derderian and other representatives of defendants, with a checklist of items to be resolved in order to close the loan, stating, "We need to stick to our proposed closing date of March 8, 2007 .... Let's get this complete and close it on Thursday." (*Id.*, Ex. 8.)

However, the loan contemplated in the Commitment Letter never closed. According to plaintiff, through a series of communications with plaintiff's representatives from March 7 to March 14, 2007, Derderian indicated that circumstances had changed such that the defendant entities would no longer need to borrow as much money from SSP and that he therefore wanted to reduce the amount of the loan under the Commitment Letter. (*Id.*, Ex. 10.) After telling plaintiff's representatives about these changed circumstances, and saying that he would have to think about plaintiff s position, (*id.*, Exs. 13–14), Derderian ultimately confirmed that he would not close the loan, (*id.* ¶ 20, Ex. 15).

On May 17, 2007, plaintiff commenced the instant action for breach of contract based on the February 22, 2007 Commitment Letter. Following pre-motion correspondence pursuant to this Court's individual practice regarding defendants' proposed motion to dismiss pursuant to Rule 12(b)(1), which motion was never filed, defendants filed their answer on October 19, 2007. Plaintiff later moved for summary judgment. Plaintiff's mo-

tion was denied at oral argument on February 2, 2009. At that argument, plaintiff conceded that the damages at issue were limited to the $132,000 loan origination fee and could not include the lost profits originally sought because the Commitment Letter did not provide for any prepayment penalty. (Tr. 10:1–10, 18:6–12.) Thereafter, we referred the case to Magistrate Judge Maas for a settlement conference. When a settlement could not be reached, defendants' instant motion for summary judgment followed.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must

produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring a trial. *See Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002).

## II. Defendants' Arguments for Summary Judgment

Defendants advance three principal arguments in support of their motion for summary judgment. We reject the first two points but agree with the third—and grant summary judgment solely on that basis.

### A. Enforceability of the Commitment Letter

■ Defendants first argue that the Commitment Letter was void for lack of consideration. We reject both aspects of this argument. First, defendants assert that certain discretionary provisions in the Commitment Letter—such as the Lender Due Diligence Period provision, which provides in relevant part that "Lender's commitment hereunder is subject to Lender's approval in its sole discretion of the Collateral, the Disclosure Materials, and other due diligence by Lender" within a defined period—render plaintiff's promise to lend illusory. (Mem. at 10.)

While certain provisions in the Commitment Letter no doubt provided plaintiff with considerable discretion, such discretionary language is not uncommon in loan commitment agreements and does not render them unenforceable. In the very first sentence of the Commitment Letter, SSP expressly states, "Subject to the terms and conditions of this letter, we have ... agreed to make a loan." (Derderian Aff., Ex. C.) In addition, the parties are still subject to an implied duty to act in good faith. *See, e.g., Paper Corp. v. Schoeller Technical Papers, Inc.,* 807 F.Supp. 337, 346 (S.D.N.Y.1992). Plaintiff's commitment to close the loan is also apparent from the objective evidence of plaintiff's subsequent course of dealing with defendants in anticipation of a closing date in early March 2007. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(a).

■ We also reject the second component of defendants' unenforceability argument—namely, that plaintiff's failure to sign the Commitment Letter renders any promise from SSP unenforceable under the applicable Statute of Frauds in New York, N.Y. G.O.L. § 5–703, and further reveals the lack of consideration running from plaintiff to defendants. Even assuming, *arguendo,* that defendants have not waived this particular argument by failing to plead the statute of frauds in their answer, *see* Fed.R.Civ.P. 8(c), the argument is nonetheless unpersuasive.

■ Although neither Gordon nor any other representative of plaintiff signed the Commitment Letter, Gordon's name appears in the closing of both the parent email and the Commitment Letter attached thereto. (*See* Gordon Aff., Exs. 2, 3.) That the Commitment Letter was attached to an electronically signed email message clearly undermines, if not defeats, defendants' statute of frauds argument. *See, e.g., Stevens v. Publicis, S.A.,* 50 A.D.3d 253, 255–256, 854 N.Y.S.2d 690 (1st Dep't 2008). In any event, this argument ultimately fails because it is well established that part performance is an accepted rejoinder to a statute of frauds defense.

Plaintiff's part performance, which is described in the Background section above, clearly demonstrates plaintiff's commitment to the loan transaction.

## B. Expiration of the Commitment Letter

■ Defendants' second argument is that, even assuming that a valid contract was formed, it expired by its terms because defendants never paid what they contend was an additional $10,000 deposit required by the Commitment Letter. This proposed interpretation cannot withstand even the most cursory analysis.

The final paragraph of the Commitment Letter, stating that, "[i]f [SSP] ... ha[s] not received your signed acceptance of this commitment and deposit check by 5 p.m. on February 23, 2007 ... this Commitment shall expire and be of no force and effect," must be read in the context of the Commitment Letter as a whole (including the Borrower Deposit provision) and the prior version embodied in the Original Commitment Letter. The first sentence of the Commitment Letter makes clear that plaintiff "amended and restated" the "Original Commitment Letter" of December 21, 2006, for which defendants had already advanced a $10,000 deposit. (Gordon Aff., Ex. 3.) In context, a reasonable

reading of the Commitment Letter's provisions cannot lead to either conclusion suggested by defendants—namely, that the contract expired or that the final "deposit check" paragraph is mere surplusage.[3]

Defendants' contention that "it is impossible to comprehend [the intended meaning of the first sentence of the Borrower Deposit paragraph] by any normal language construction" is absurd. It is obvious that this argument, which is premised on the absence of a period, seeks to make much ado about nothing more than a "typo". Clearly, this Borrower Deposit paragraph was a modification of the parallel paragraph in the Original Commitment Letter. Defendants' attempt to convert the resulting "typo" into an argument of ambiguity is unfounded.[4] Even if the "typo" explanation were less clear, our conclusion would not change, since the initial capitalization that immediately follows clarifies the structure of these sentences. (*See* Gordon Aff., Ex. 3.)

Thus, the sentence beginning "In addition to the $10,000 deposit ..." does not refer to a second $10,000 deposit but rather to a potentially additional advance for any retainer fees in connection with the closing—if and only if such deposit were requested in writing by the plaintiff. (*See id.*) However, no evidence other than Derderian's self-serving statements[5] indi-

---

**3.** The reference to a "deposit check" in the final paragraph is not a nullity because, as discussed below, plaintiff could still have written to defendants to request an additional deposit for their counsel's retainer if needed.

We note further that defendants' purported reliance on the final paragraph as an unambiguous indication that an (additional) deposit check was required by February 23, 2007 at 5:00 p.m. seems to ignore the fact that defendants signed the Commitment Letter on that very date without submitting any additional deposit, which begs the question of why defendants' were indicating their acceptance of an agreement which they now assert would have expired only hours afterward.

**4.** *See Brass v. American Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir.1993) ("Straining a contract's language beyond its reasonable and ordinary meaning does not create an ambiguity.").

**5.** Defendants' conclusory assertion that Gordon orally demanded an additional deposit of $10,000 is directly controverted by Gordon's affidavit, (Gordon Aff. ¶ 9), and furthermore would be ineffective under the express terms of the parties' agreement, which requires a written request.

cates that such a request was ever made, and plaintiff directly contradicts this assertion. Accordingly, the contract did not expire.

### C. Defendants' Purported Obligation to Borrow

■ Defendants' third argument—that they did not breach the Commitment Letter by failing to close the loan because the letter did not impose any binding affirmative obligation to borrow—is more persuasive than their first two. We agree that the Commitment Letter did not impose on defendants a duty to close.

■ The parties' dispute with respect to this issue turns on the only language in the Commitment Letter that arguably refers to an obligation to close—a portion of the Borrower Deposit provision, which provides in relevant part:

> [T]his deposit and additional deposit shall be applied to Borrower's obligation to pay all costs to Lender associated with this transaction or to Borrower's obligations at Loan Closing, or *in the event Borrower fails to close as required by this Commitment after acceptance of the Commitment by Borrower*, this deposit shall be forfeited to Lender. Such forfeiture shall not limit Lender's reme-

dies in the event of Borrower's default hereunder.

(Gordon Aff., Ex. 3 (emphasis added).) In our previous ruling denying plaintiff's motion for summary judgment, we found that the Commitment Letter is ambiguous with respect to defendants' duty to close. (Tr. 17:17.)[6] SSP accepts that ruling for purposes of this motion. (Opp. at 16.)

At the outset, we make the following observations about this central provision: while the phrase "to close as required by this Commitment" in the Borrower Deposit provision reads as though it refers to another portion of the Commitment Letter, no other provision expressly provides that defendants were agreeing to borrow or to close the loan.[7] Notably, the absence of such a provision stands in stark contrast to the letter's opening sentence, in which plaintiff states that they "agreed to make a loan." In addition, the Commitment Letter contains no express closing date.[8]

Moreover, the Commitment Letter contemplates the possibility that the loan will not close. Obviously, the failure to close could be the result of various scenarios. The issue presented here is what is the consequence to the borrower when the borrower decides not to borrow. The agreement explicitly provides for two consequences: (i) forfeiture of the defendants'

---

**6.** Contractual language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992)).

**7.** *Compare, e.g.,* Derderian Aff., Exs. D, E, F (attaching examples of commitment letters at issue in *Resource Mtg. Banking v. Turley*, 233 A.D.2d 308, 649 N.Y.S.2d 181 (2d Dep't

1996), *Teachers Ins. & Annuity Ass'n v. Coaxial Commc'ns*, 807 F.Supp. 1155 (S.D.N.Y. 1992), and *Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal*, 791 F.Supp. 401 (S.D.N.Y.1991)).

**8.** In this connection, we emphasize that our mentioning the absence of a closing date here is relevant to the ambiguity regarding *defendants'* obligation to close. In light of plaintiff's subsequent correspondence naming a specific target date for closing in early March 2007, the absence of a closing date does not render the contract itself unenforceable. *Cf.* Part II.A, *supra.*

deposit, as provided in the Borrower Deposit provision; and (ii) responsibility for all costs of the transaction (whether or not the loan closes), as provided in the Costs provision. (*See* Gordon Aff., Ex. 3.) There is no dispute that the lender can retain the $10,000 deposit—and plaintiff is not seeking costs.[9]

Rather, plaintiff seeks the $132,000 loan origination fee that it would have earned had the loan closed. Plaintiff cannot point to any specific provision in the Commitment Letter which entitles it to earn an origination fee when the loan does not close. Instead, plaintiff relies on the language in the Borrower Deposit provision that the forfeiture of the deposit does not limit its remedies in the event of the borrower's default. However, this provision, which on its face covers many possible breaches by the borrower (such as a failure to repay the loan), is not inconsistent with forfeiture of the deposit or payment of costs being the sole consequences of a failure to close. As the drafter of the Commitment Letter, plaintiff would typically be charged with the ambiguities in the document. *See Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 161 (2d Cir.2003) ("[W]e generally interpret contractual ambiguities against the drafter."). Nonetheless, plaintiff seeks to avoid dismissal at this stage by arguing as a threshold matter that any ambiguity regarding defendants' obligation to borrow must be resolved by a jury. (Opp. at 16.)

While the meaning of ambiguous contracts is a question of fact for the factfinder where relevant extrinsic evidence is available as to the agreement's meaning at the time it was made, courts may properly construe the meaning of even an ambiguous contract on summary judgment where no relevant extrinsic evidence exists. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir.2006); *Revson*, 221 F.3d at 66 (citing *Brass*, 987 F.2d at 148, *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462–63, 435 N.E.2d 1075 (1982)). Under New York law, only objective manifestations of intent are deemed relevant. *Faulkner v. Nat'l Geographic Soc'y*, 452 F.Supp.2d 369, 378 (S.D.N.Y.2006) ("*Faulkner III*").

Here, the record is devoid of any contemporaneous objective extrinsic evidence that defendants were bound to close the loan.[10] As discussed above, the objective extrinsic evidence regarding plaintiff's conduct following the execution of the Commitment Letter is consistent with plaintiff's agreement to lend. Insofar as there is contemporaneous extrinsic evidence of conduct by the defendants following the execution of the Commitment Letter, such conduct is wholly consistent with the defendants' position that they were under no commitment to borrow. Thus, the record on the instant motion confirms what the parties had suggested at oral argument on plaintiff's motion for sum-

---

**9.** *See* Yeskoo Letter, June 18, 2008, at 3 ("Plaintiff is suing for both the lost loan origination fee, which is a determinate amount of $132,000, and its lost profits."), *see also* Tr. 18:6–12, 19:11–12 (discussing plaintiff's concession that damages would be limited to $132,000).

**10.** While plaintiff cites the deposition testimony of Derderian, defendants' principal, regarding his interest in closing the loan, defendants offer Derderian's subsequent (and somewhat contradictory) affidavit to bolster their argument that the contract contained *no* duty to close. In any event, "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." *Faulkner III*, 452 F.Supp.2d at 378. Similarly, Derderian's legal conclusions with respect to whether the Commitment Letter was binding are inadmissible. *Id.* at 379 (citing cases).

mary judgment: that there is no relevant extrinsic evidence to inform a potential factfinder's analysis. (*See* Tr. 14:16–16:6, 15:15–19.) Accordingly, nothing would be gained from proceeding to a trial in this case. *Cf. Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing Advisory Committee Note to Rule 56 and noting that the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial").

Having concluded, as a threshold matter, that it is proper for this Court to construe the Commitment Letter, we construe the ambiguous language in that agreement against plaintiff, the drafter, and find that defendants did not have a duty to close. Although plaintiff and defendants are all sophisticated parties, construing this ambiguity against plaintiff is nevertheless both reasonable and proper here because SSP is in the business of making loans and drafting form agreements such as the Commitment Letter. Construing the Borrower Deposit provision and Costs provisions against plaintiff is especially reasonable because these provisions in particular were drafted for plaintiff's benefit. That SSP apparently could not draft these or other provisions of its form loan commitment letter with greater clarity or perhaps with more severe consequences in the event defendants failed to close the loan does not mean that this Court should redraft those provisions in SSP's favor.

Accordingly, since the Commitment Letter did not impose on defendants a duty to borrow, their failure to close the loan did not constitute a breach of that agreement.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and the complaint is dismissed in its entirety. The Clerk is respectfully instructed to close the case.

**SO ORDERED.**