**BULLDOG NEW YORK LLC, Plaintiff,**

v.

**PEPSICO, INC., and Pepsi–Cola Advertising and Marketing, Inc., Defendants.**

**Civil No. 3:08cv1110(AWT).**

United States District Court, D. Connecticut.

Signed March 31, 2014.

Jonathan J. Kelson, Matthew C. Wagner, Diserio Martin O'Connor & Castiglioni LLP, Stamford, CT, for Plaintiff.

Catherine Dugan O'Connor, Day Pitney LLP, One Canterbury Green, Stamford, CT, Elizabeth Ann Alquist, Michael A. Bucci, Day Pitney LLP, Hartford, CT, for Defendants.

## *RULING ON MOTION FOR SUMMARY JUDGMENT*

ALVIN W. THOMPSON, District Judge.

Bulldog New York LLC ("Bulldog"), a Delaware limited liability company with its principal place of business in Connecticut, filed a nine-count First Amended Complaint against defendants Pepsico, Inc. ("Pepsico") and Pepsi–Cola Advertising and Marketing, Inc. ("PCAM") (collectively, "Pepsi"). Count 1 alleges breach of contract based on a May 18, 2007 letter of intent between Bulldog and PCAM. Count 2 alleges misappropriation of trade secrets in violation of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35–51, based on actions taken by representatives of PCAM and Pepsico, and Count 3 alleges common law misappropriation of trade secrets in violation of New York law for the same actions. Count 4 alleges tortious interference with business opportunity in violation of both Connecticut and New York law based on actions taken by Pepsico and PCAM during the

course of their relationship with Bulldog. Count 6 alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110. Counts 5, 7, 8, and 9 were previously dismissed by the court.

## I. Factual Background

In late 2004, Bulldog approached Pepsico and PCAM to pitch the idea of developing a Pepsi-branded consumer experience in Times Square, New York City. This project was codenamed "Sinatra" (the "Bulldog Project") in order to maintain its confidentiality and to prevent information from leaking to both Pepsi's competitors and customers. The Bulldog Project evolved over time, particularly as it changed potential locations within the Times Square area. On occasion, Bulldog presented to various Pepsi representatives slide shows, referred to as "decks," demonstrating the potential attractions and aspects of the Bulldog Project, including presentations that referred to the Bulldog Project using the title "Rise." At least one in-person meeting occurred on Friday, May 4, 2007 between the Bulldog team and the Pepsico and PCAM teams at Pepsi headquarters in Purchase, New York, where a presentation about the Bulldog Project was made. On May 18, 2007, Bulldog and PCAM entered into a letter of intent (the "Bulldog LOI"). It was signed by David Marchi ("Marchi") on behalf of Bulldog and Russell Weiner on behalf of PCAM. Throughout the parties' relationship, all in-person meetings took place either at the Pepsi headquarters or in Times Square, New York.

Prior to the signing of the Bulldog LOI, a number of emails were exchanged among Pepsico, PCAM, and Bulldog, as well as counsel representing the three parties, to determine the scope of the Bulldog Project at Times Square and to negotiate the language of the Bulldog LOI. The parties agreed that New York law would govern the Bulldog LOI. Both before and after the execution of the Bulldog LOI, Bulldog worked closely with Pepsi's Director of Marketing, Kristina Mangelsdorf ("Mangelsdorf"). Pepsi's then President and CEO of PepsiCola North America and Pepsico Food Service, Dawn Hudson ("Hudson"), was also a party to several emails and meetings with respect to the Bulldog LOI and the Bulldog Project.

On or about June 6, 2007, Mangelsdorf made a phone call to Marchi informing him that Pepsi would not be going forward with the Bulldog Project at Times Square. Subsequent to that phone call, Marchi sent an email to Mangelsdorf requesting, *inter alia*, that final costs expended by Bulldog during the presentations of the Bulldog Project be reimbursed by PCAM pursuant to the Bulldog LOI. The parties disagree about whether that phone call and email exchange terminated the agreement, or whether the agreement was terminated only after a confirmatory writing was sent to Marchi on June 23, 2008, more than a year later, indicating that the contract was terminated.

Pepsico and PCAM claim that as early as December of 2006, Matti Leshem ("Leshem"), president of Protagonist, a third party vendor to Pepsi, brought to Pepsi's attention a sponsorship opportunity with a company called Xanadu Ventures for a project at "Meadowlands Xanadu" in New Jersey (the "Xanadu Project"). Bulldog claims that confidential information regarding its Bulldog Project was misappropriated by the defendants and divulged to the Xanadu Project team during and after the time that the Bulldog LOI was in effect. It is undisputed that at least one in-person meeting occurred in May 2007 that included Leshem, the Xanadu Project team, and the Pepsico and PCAM teams.

The parties disagree about whether any confidential information regarding the Bulldog Project was divulged to the Xanadu Project team.

The parties also disagree about whether the Bulldog LOI was entered into in good faith or was an effort on the part of Pepsico and PCAM to delay Bulldog from further developing the Bulldog Project or marketing it to Pepsi competitors while the final details of the Xanadu Project were being completed with Protagonist.

A contract was signed committing Pepsi to the Xanadu Project on or around January 2, 2008. In February 2008, through a press release, Xanadu Ventures announced that Pepsi was entering into a 10–year "tenant/naming rights" agreement with Meadowlands Xanadu. Bulldog claims that various aspects of the Xanadu Project that were highlighted in this press release are identical or substantially similar to aspects originally included in the Bulldog Project.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there

are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Id.* Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of*

*Columbia University,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. Discussion

First, the court must determine which law governs each of the plaintiff's claims in accordance with Connecticut choice of law rules. Then the court must determine with respect to each claim whether genuine issues of material fact exist based on the substantive law that governs that claim. At each stage, the evidence in this case must be assessed in a light most favorable to the non-movant, here the plaintiff. *See e.g., Doninger v. Niehoff,* 642 F.3d 334, 344 (2d Cir.2011).

### A. Choice of Law

■ A federal trial court sitting in diversity jurisdiction must apply the law of the forum state, which in this instance is Connecticut, to determine the choice-of-law rules. *Bigio v. Coca–Cola Co.,* 675 F.3d 163, 169 (2d Cir.2012). Here, the Bulldog LOI provides that the "letter of intent and all matters or issues collateral thereto shall be governed by the laws of the State of New York, without regard to its conflict of law provisions." (Ex. 16 to Defs.' Local Rule 56(a)1 Statement (Doc. No. 139–16) ("Ex. 16"), at 1.) Connecticut law "give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar,* 238 Conn. 839, 679 A.2d 937, 942 (1996); *see also Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir. 2001). Neither party contests the validity of the choice-of-law provision in the Bull-

dog LOI. Accordingly, the court applies New York law in construing the contract claims relating to the Bulldog LOI in Count 1.

Although it is arguable that the choice of law provision in the Bulldog LOI includes within its scope the remaining claims, the parties have not raised that point.

■ In resolving choice of law issues for tort claims in Connecticut when there is no agreement between the parties, it is first necessary to establish whether an actual conflict of law exists as the result of which the application of law of one jurisdiction would produce differing results from the application of that of another. *See Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 830 A.2d 752, 758 (2006). If so, then "the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury," also known as *"lex loci delicti",* typically applies. *O'Connor v. O'Connor,* 201 Conn. 632, 519 A.2d 13, 15 (1986). However, the Connecticut Supreme Court has held that *lex loci delicti* does not apply to a tort claim when the application would undermine expectations of the parties or an important state policy, when the application would produce an arbitrary and irrational result, or where "reason and justice" counsel for the application of a different principle. *Id.* at 15, 21. In such cases, Connecticut courts are required to apply the "most significant relationship" analysis as set forth in the Restatement (Second) of Conflict of Laws § 145(1) (1971) (the "Restatement (Second)"). *Id.* at 22.

■ Here, assuming the place of injury would be Connecticut, where Bulldog felt the economic consequences of the defendants' actions, application of *lex loci delicti* would undermine the expectations of the parties that New York law would govern their relationship, as expressed in the

choice of law provision in the Bulldog LOI. Although Bulldog argues that "the application of *lex loci* would not undermine the parties' expectations" because "Pepsi obviously knew it was working with, dealing with, communicating with, negotiating with, and paying[ ] a Connecticut entity", the plain language of the Bulldog LOI undermines this contention. (Pl.'s Mem. Opp. Mot. Summ. J. (Doc. No. 147) ("Pl.'s Mem."), at 37.) The choice-of-law provision in the Bulldog LOI reads: "This letter of intent and all matters or issues collateral thereto shall be governed by the laws of the State of New York, without regard to its *conflict of law provisions*." (Ex. 16, at 2.) The parties' choice of New York law is not limited to disputes as to the interpretation or enforcement of the Bulldog LOI, but is extended to "all matters or issues collateral thereto." (*Id.*) While it is not clear as a matter of law whether every claim raised in the First Amended Complaint would be within the scope of the clause, and the court does not reach this point because the parties did not brief the issue, the parties' expectations for purposes of *lex loci delicti* analysis can be determined by reference to the provision. The language of the Bulldog LOI makes it clear that the parties intended that all disputes, whether directly related or incidental to the Bulldog LOI, would be governed by New York law. Thus, applying *lex loci delicti* would undermine the expectations of the parties, and the court must use the most significant relationship test instead.

Section 145(1) of the Restatement (Second) provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) § 145(1). Section 6(2), in turn, states that the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) § 6(2). The Connecticut Supreme Court has directed that "[f]or assistance in [their] evaluation of the policy choices set out in §§ 145(1) and 6(2)" courts should look to Section 145(2), since it "establishes black-letter rules of priority to facilitate the application of the principles of § 6 to torts cases." *O'Connor*, 519 A.2d at 23. Section 145(2) calls for consideration of:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) § 145(2). These factors are "to be evaluated according to their relative importance with respect to the particular issue." *Id.; see also Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 190–91 (2d Cir.2009).

■ "In addition, when appropriate, Connecticut Courts apply the principle of

depecage, whereby 'different issues in a single case may be decided according to the substantive law of different states.'" *In re Helicopter Crash Near Wendle Creek, British Columbia on August 8, 2002*, 485 F.Supp.2d 47, 57 (D.Conn.2007) (quoting *Reichhold Chems., Inc. v. Hartford Accident & Indem. Co.*, 252 Conn. 774, 784, 750 A.2d 1051 (Conn.2000)). Therefore, each count in this case will receive an individualized choice of law analysis.

### 1. Counts 2 and 3: Misappropriation of Trade Secrets

As mentioned above, the choice of law analysis must be undertaken while assessing the evidence in a light most favorable to the non-movant. *See e.g., Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.2011). Bulldog contends that Connecticut law should govern its misappropriation claim because: (1) Bulldog remains, and was at all times relevant to this dispute, based in Connecticut; (2) Bulldog developed the idea for the Bulldog Project in Connecticut; (3) Bulldog engaged in numerous teleconferences and electronic communications with Pepsi from Connecticut, and those communications were clearly marked as coming from Connecticut either in the signature block of the email or because the telephone numbers used were Connecticut numbers; and (4) the Bulldog LOI was signed by Bulldog in Connecticut and was to be performed in Connecticut. Pepsi argues that New York law should apply because the Bulldog Project was always tied to Times Square in New York, and that the essence of the Bulldog Project "was to capitalize on the tourism market of Times Square." (Defs.' Mem. Supp. Mot. Summ. J. (Doc. No. 138) ("Defs.' Mem."), at 42.) Pepsi also points to the fact that all live meetings occurred at Pepsi's Headquarters in Purchase, New York, and that

all of Pepsi's decisions and communications emanated from New York.

Neither party disputes the facts presented by the other; instead, they disagree about the relative weight that should be given to each fact in determining which state's law should apply.

■ As discussed above, the first step in the choice of law analysis is to establish that an actual conflict of law exists, and that the application of law of either jurisdiction would not produce the same result. *See Dugan v. Mobile Med. Testing Servs., Inc.*, 265 Conn. 791, 830 A.2d 752, 758 (2006). Because Connecticut has adopted the Uniform Trade Secrets Act and New York has not, the choice of which state's law to apply will make a difference in the court's analysis as to Counts 2 and 3. *See Evans v. General Motors Corp.*, 277 Conn. 496, 893 A.2d 371, 382 n. 13 (2006). In fact, these two counts cannot both be brought. If New York law applies, the CUTSA claim in Count 2 cannot be brought; if Connecticut law applies, a common law claim for misappropriation of trade secrets is preempted by CUTSA. Thus, an actual conflict of law exists for these counts.

Next, the Restatement (Second) § 145(2) factors must be used to facilitate the application of "the § 6 guidelines to the circumstances of the present case." *O'Connor*, 519 A.2d at 23. Section 145(2)(a) of the Restatement calls for an analysis of the location of the injury. However, for trade secret claims, the Restatement (Second) does not put significant weight on this factor, stating that "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts." Restatement (Second) § 145 cmt.f. As the Restatement (Second) points out, the "location of injury" for

misappropriation claims is often not easily identifiable, and is therefore less important than it otherwise might be. Under the circumstances of this case, it is most likely that the injury occurred where the economic impact was felt, namely Bulldog's headquarters in Connecticut. *Cf. Uniroyal Chem. Co., Inc. v. Drexel Chem. Co. Inc.*, 931 F.Supp. 132, 140 (D.Conn.1996) ("[U]nder Connecticut's choice of law principles, a tort is deemed to have occurred where the injury was sustained, and in misrepresentation cases, the injury occurs where the 'economic impact' is felt.").

In direct contrast, the Restatement (Second) places particular importance on the factor enumerated in Section 145(2)(b), "the place where the conduct causing the injury occurred," when analyzing misappropriation claims. A comment to this section notes that "the principal location of the defendant's conduct is the [factor] that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values." Restatement (Second) § 145 cmt.f. Here, Bulldog's allegations suggest that its trade secrets, which were contained in confidential presentation decks and emails to Pepsi representatives, were misappropriated when Pepsico and PCMA revealed them to a competitor from the Xanadu Project during a meeting or meetings at, or by otherwise sending information from, Pepsi's headquarters in New York. Thus, it is apparent that the location of the defendants' conduct that led to Bulldog's injury is New York.

The factor to be analyzed under Section 145(2)(c)—"the domicile, residence, nationality, place of incorporation and place of business of the parties"—does not favor one state's laws over the other. "At least with respect to most issues, a corporation's principal place of business is a more important [factor] than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." Restatement (Second) § 145 cmt.e. Although all parties in this action are incorporated in Delaware, that state has no other relation to the case. Bulldog is primarily located in Connecticut (despite the fact that it does business under the name "Bulldog New York"), and Pepsico and PCAM are headquartered in New York, but do business nation-wide.

Finally, Section 145(2)(d) calls for an analysis of the place where the relationship is centered. *Dugan v. Mobile Med. Testing Servs., Inc.*, 265 Conn. 791, 830 A.2d 752, 758 (2003) is instructive. There, although the plaintiff was domiciled in the same state in which the defendant was incorporated (Connecticut), the Connecticut Supreme Court held that the relationship was centered in New York because that was the situs of the interactions which formed the basis of the plaintiff's complaint. The court stated that "the relationship between the parties, which was based solely on [the defendant's] administration of the plaintiff's fitness for duty examination [for employment in New York's Fire Department], was centered in New York." *Id.* at 760. Here, the dispute underlying Counts 2 and 3 arises out of a business venture focusing exclusively on Times Square in New York City, and all meetings between Bulldog and Pepsi took place either at Pepsi's location in Purchase or in Times Square. It is plain, then, that the focal point of this relationship was New York City. Therefore, this factor points to the application of New York law for Counts 2 and 3.

Because two of the Section 145(2) factors favor applying New York law, and one of these two factors is traditionally given

the most weight in misappropriation choice of law analyses, and of the other two factors one does not favor application of the law of either state and the factor favoring Connecticut law does not receive significant weight, the court finds that New York has the most significant relationship to the misappropriation of trade secrets claims and its law should be applied. *Cf. Id.* at 760–61 (holding that New York law applied when "the injury causing conduct occurred in New York, and ... the relationship between the parties was centered in New York," even though both parties were domiciled in Connecticut and the injury occurred in Connecticut).

Consequently, the motion for summary judgment is being granted as to Count 2 of the First Amended Complaint, as the cause of action there is available only under a Connecticut statute.

### 2. Count 4: Tortious Interference with Business Expectancy [1]

■■■■ The court must first determine whether an actual conflict of law exists. Under Connecticut law, "the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional in-

terference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *American Diamond Exchange, Inc. v. Alpert,* 302 Conn. 494, 28 A.3d 976, 986 (2011) (citing *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.,* 255 Conn. 20, 27, 761 A.2d 1268 (Conn.2000)). Under New York Law, "to prevail on a claim for tortious interference with business relations ..., *four* conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) *the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means;* and (4) the defendant's acts injured the relationship." *Catskill Development, L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir.2008) (emphasis added). The Connecticut Supreme Court includes the "additional" New York element of wrongful purpose as an element necessary to prove interference with contractual relations, but does not include it in the list of elements for interference with business expectancy. *Compare Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 757 A.2d 1059, 1063 (2000) *with American Diamond Exchange,* 28 A.3d at 986.[2]

---

**1.** The plaintiff's First Amended Complaint does not make clear whether Count 4 for "Tortious Interference" is a claim for tortious interference with contractual relations or tortious interference with business expectancy and/or prospective economic advantage. However, in its memorandum of law, Bulldog "identifie[s] several business opportunities and relationships with third parties[,]" that it contends "Pepsi interfered with ... by willfully failing to comply with, and having no intention of complying with in the first instance, its obligations under the May 2007 Agreement." Pl.'s Mem., at 33–34. But, the plaintiff does not identify any actual, preexisting contracts with which the defendants interfered. Therefore, because tortious interference with contractual relations requires the existence of an enforceable contract, this count is construed,

in the light most favorable to the non-movant, to assert a claim for tortious interference with business expectancy. *See Catskill Development, L.L.C. v. Park Place Entertainment Corp.,* 547 F.3d 115, 132 (2d Cir.2008).

**2.** The court recognizes that the Connecticut Appellate Court has on at least one occasion read the wrongful purpose requirement into the tortious interference with business expectancy tort. *See American Diamond Exchange, Inc. v. Alpert,* 101 Conn.App. 83, 920 A.2d 357, 363 (2007). The Appellate Court remanded *Alpert* to the trial court, which then entered judgment for the plaintiff consistent with the Appellate Court's holding. This decision was then appealed to the Connecticut Supreme Court. *See American Diamond Ex-*

The Second Circuit has recognized that the "wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference" claim without that element. *Catskill Development*, 547 F.3d at 132. Thus, because New York law contains an added element, which makes proving the claim more demanding, the court concludes that an actual conflict of law exists with respect to Count 4, necessitating an analysis under Section 145(2).

■■■ As to Section 145(2)(a), the location of the injury to the plaintiff, that factor favors application of Connecticut law. The business relationships the plaintiff claims were interfered with would have benefited it financially, and it appears that the economic impact of losing business relationships would be felt at its Connecticut headquarters.

As to Section 145(2)(b), the place where the conduct causing the injury occurred, that factor favors application of New York law. Bulldog claims that the actions Pepsico and PCAM took with respect to the Xanadu Project and the announcement concerning it interfered with its prospective business relations. These actions, even if they were directed to other states, were initiated at or emanated from Pepsi's New York headquarters. None of the allegedly interfering conduct occurred in Connecticut; Pepsico and PCAM representatives acted exclusively in New York.

The analysis under the factor in 145(2)(c) is the same as that with respect to the claim for misappropriation of trade secrets, and this factor does not favor one state's laws over the other. The analysis under the factor in 145(2)(d) is also the same as that with respect to the claim for misappropriation of trade secrets, and this factor clearly favors application of New York law.

Thus, two factors, the place where the conduct causing the injury occurred and the place where the relationship between the parties is centered, favor application of New York law, while the place where the injury occurred favors application of Connecticut law, and the remaining factor is neutral. Although Connecticut may have a policy interest in protecting its resident corporations from tortious interference with their business expectancies using its less stringent standard (*see* Restatement (Second) § 6(2)(b)), this alone is not enough to tilt the balance in favor of the application of Connecticut law, as New York would also have a policy interest in protecting its resident corporations from claims for tortious interference under a looser standard than what is normally applicable to them. *See* Restatement (Second) § 6(2)(c). Additionally, to the extent the parties identified a state's law to govern their relationships, they identified New York law. *See* Restatement (Second) § 6(2)(d). Therefore, the court finds that New York law should apply to plaintiff's claim for tortious interference with business relations.

### 3. Count Six: Connecticut Unfair Trade Practices Act

■■■ Tort choice of law rules generally are also applied to determine whether a CUTPA claim can proceed. *See Macomber v. Travelers Prop. and Cas. Corp.*, 277 Conn. 617, 894 A.2d 240, 256–56 (2006); 12 Conn. Prac., Unfair Trade Practices § 8.1. Therefore, the same Restatement (Second) analysis that has been used for the other counts is necessary for Count 6.

*change,* 28 A.3d at 986. There, however, the Connecticut Supreme Court did not consider wrongfulness as an element of this tort.

Therefore, the court interprets the tort of interference with business expectancy as not requiring this element under Connecticut law.

■ The alleged CUTPA violation here occurred in New York. However, "CUTPA does not require that a violation actually occur in Connecticut, if the violation is tied to a form of trade or commerce intimately associated with Connecticut or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law." *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher–Price, Inc.*, 406 F.Supp.2d 175, 200 (D.Conn.2005) (internal citations and quotations omitted).

■ Connecticut choice of law principles do not dictate application of Connecticut law with respect to the CUTPA claim. The plaintiff's CUTPA claim has, as its core, claims of conduct that constitutes misappropriation of trade secrets and tortious interference. Therefore, the analysis of each element under Section 145(2) for the CUTPA claim will be a combination of the analyses for those same elements with respect to the misappropriation and tortious interference claims. Section 145(2)(a) favors application of Connecticut law on the misappropriation claim, albeit slightly, and on the tortious interference claim, so this element favors application of Connecticut law to the CUTPA claim as well. Section 145(2)(b) strongly favors application of New York law to both the misappropriation and tortious interference claims, so that element also strongly favors the application of New York law to the CUTPA claim. Section 145(2)(c) is neutral with respect to the previous two claims, so is also neutral for the CUTPA claim. Finally, Section 145(2)(d) also strongly favors application of New York law to the misappropriation and tortious interference claims, and therefore strongly favors application of New York law to the CUTPA claim. Thus, since two factors strongly favor the application of New York law, one factor favors the application of Connecticut law, and the final factor is neutral, the court concludes that Connecticut choice of law principles dictate the application of New York, not Connecticut, law to this claim.

A CUTPA claim can also be brought where a violation did not actually occur in Connecticut "if the violation is tied to a form of trade or commerce intimately associated with Connecticut", but that is not the case here. As discussed above, the trade or commerce at issue here was associated exclusively with Times Square in New York City.

Thus, because neither of the conditions for bringing a CUTPA claim where the violation does not actually occur in Connecticut are met here, Bulldog cannot bring a CUTPA claim, and the motion for summary judgment is being granted as to Count 6 of the First Amended Complaint.

### B. Claims in Count 1, 3, and 4

The court has granted the motion for summary judgment as to Counts 2 and 6 based on the choice of law analysis. The remaining claims are Count 1, breach of contract as against PCAM only; Count 3, misappropriation of trade secrets under New York law; and Count 4, interference with business relations under New York law.

#### 1. Count 1: Breach of Contract

The plaintiff claims that PCAM breached the Bulldog LOI when it failed to: (a) work in good faith with Bulldog for at least 120 days following execution of the Bulldog LOI to develop the Bulldog Project; (b) work with Bulldog, following the expiration of the 120–day period, to recruit a third-party to be the owner/operator of the Bulldog Project; (c) use its best efforts to assist and support Bulldog in its attempts to negotiate a business deal with a third-party owner operator; (d) pay Bulldog a bonus in the amount set forth in the Bull-

dog LOI; and (e) reach an agreement with Bulldog on additional compensation for the Bulldog Project. Bulldog also claims that PCAM's alleged misappropriation of trade secrets violated the confidentiality provisions of the Bulldog LOI.

 Under New York law, a claim for breach of contract requires: "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (N.Y.App.Div.2010).

The parties do not dispute that the first two elements—the existence of a contract and the plaintiff's performance—are satisfied in this case by the Bulldog LOI and Bulldog's performance thereunder. However, the parties disagree about whether PCAM, in fact, failed to comply with its obligations under the Bulldog LOI, and, if so, what Bulldog's resulting damages were.

In determining whether a genuine issue of material fact exists with respect to PCAM's alleged breach of the Bulldog LOI, the threshold question is when the Bulldog LOI was terminated. It is undisputed that on or around June 6, 2007, a representative from PCAM, Mangelsdorf, called Marchi and orally informed him of PCAM's intent to terminate the contract. This conversation was acknowledged on the same day in an e-mail from Marchi in his capacity as Bulldog's President. Over a year later, on June 23, 2008, PCAM sent a letter to Bulldog to "confirm termination of the LOI." The Bulldog LOI provides that "[e]ither party may terminate this letter of intent at any time with ten (10) days written notice", and further provides that "Pepsi and Bulldog will work together in good faith over the next 120 days on a scope of work for the next phase of the Project.... After the 120 day period, Pepsi and Bulldog will work together in good

faith to execute a deal, to the mutual satisfaction of Pepsi and Bulldog, with a third party to be the owner/operator of the Project...." (Ex. 16, at 1.) The parties disagree about whether the combination of Mangelsdorf's oral statement and Marchi's written confirmation (as well as the parties' subsequent actions) effectively terminated the contract.

 Under New York law,

> when parties agree that a written contract can be terminated on written notice (or that the agreement cannot be terminated orally), the requirement that the notice be written cannot be waived except in writing, nor can the parties mutually consent to abandon the contract and substitute another in its place unless there is a writing signed by the party against whom the termination or abandonment is sought to be enforced.

*Israel v. Chabra*, 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374, 379 (2009) (interpreting the provisions of General Obligations Law § 15–301(1)) (internal citations omitted). This holds true even when the contract can be terminated unilaterally. New York General Obligations Law Section 15–301(4) states:

> If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent.

Thus, under New York law, if the parties have agreed that the contract cannot be terminated orally, a valid termination can only be effected by either a signed notice of termination or a writing waiving the provision signed by or on behalf of the party against whom the waiver is sought to be enforced.

Here, it is undisputed that there was no written notice of termination prior to June 23, 2008, when PCAM sent a letter "confirming" that the Bulldog LOI had been terminated in June 2007. In her deposition, Mangelsdorf stated the following:

Q: Did PCAM provide written notice to Bulldog?

A: No.

Q: Did anyone provide written notice to Bulldog?

A: I provided verbal notice, to which he responded in writing.

(Ex. 3 to Defs.' Local Rule 56(a)(1) Statement (Doc. No. 139–3), at 44–45.) Furthermore, neither party contends that Marchi's confirmation email, sent the same day, constitutes written notice of termination. Instead, the parties disagree about whether Marchi's email acts as a written waiver sufficient to obviate PCAM's obligations under the written termination clause.

Under New York law, the sufficiency of an email to act as a signed writing is not settled. For example, several courts have found that "e-mails ... constitute 'signed writings' within the meaning of the statute of frauds, since [the party's] name at the end of his e-mail signifie[s] his intent to authenticate the contents...." *Stevens v. Publicis S.A.*, 50 A.D.3d 253, 255–56, 854 N.Y.S.2d 690 (N.Y.App.Div.2008), *lv. dismissed* 10 N.Y.3d 930, 862 N.Y.S.2d 333, 892 N.E.2d 399 (2008); *see also European Sch. of Econs. Found. v. Teknoloji Holdings A.S.*, No. 08 Civ. 2235(TPG), 2011 WL 1742017 (S.D.N.Y. May 4, 2011); *Williamson v. Delsener*, 59 A.D.3d 291, 874 N.Y.S.2d 41 (N.Y.App.Div.2009).[3] However, New York courts have in at least cases refused to find that an email containing a signature necessarily satisfied the signed writing requirement, holding that "[t]he act of identifying and sending a document to a particular destination does not, by itself, constitute a signing authenticating the contents of the document." *Mark Bruce Int'l, Inc. v. Blank Rome LLP*, 19 Misc.3d 1140(A), 866 N.Y.S.2d 92, at *6 (N.Y.Sup.Ct. May 23, 2008), *aff'd* 60 A.D.3d 550, 876 N.Y.S.2d 19 (N.Y.App.Div. 2009). In particular, these courts have found that an email "which contained a *pre-printed signature* [ ] was not a sufficient writing under the statute of frauds." *Bayerische Landesbank v. 45 John St. LLC*, 102 A.D.3d 587, 587, 960 N.Y.S.2d 64 (N.Y.App.Div.2013) (emphasis added); *see also Mark Bruce Intl., Inc.*, 19 Misc.3d 1140(A), at *6 (comparing pre-printed signature blocks in emails to "automatic imprinting, by a fax machine, of the sender's name at the top of each page transmitted," which the New York Court of Appeals held did not satisfy the requirement for a signed writing in *Parma Tile Mosaic & Marble Co., Inc. v. Estate of Short*, 87 N.Y.2d 524, 640 N.Y.S.2d 477, 663 N.E.2d 633 (1996)).

There is no evidence in the record as to whether the signature block in Marchi's June 6, 2007 email to Mangelsdorf was pre-printed or typed in by Marchi. Neither party has stipulated that this block of text containing Marchi's name, Bulldog's operating name, Marchi's cellphone number, and a fax number was either "manually typ[ed]" by Marci or "automatic[ally]

**3.** The court notes that these cases do not deal with Section 15–301 specifically, but instead with the sufficiency of emails as signed writings for the purposes of the statute of frauds (N.Y. Gen. Oblig. L. §§ 5–701 to 5–705). However, New York courts have treated the writing requirement as being the same for purposes of Section 15–301 and the statute of frauds. *See, e.g., Israel v. Chabra*, 601 F.3d 57, 61 (2d Cir.2010) (referring to 15–301 as a "private statute of frauds"); *# 1 Funding Ctr., Inc. v. H & G Operating Corp.*, 48 A.D.3d 908, 910, 853 N.Y.S.2d 178 (N.Y.App.Div.2008).

imprint[ed]" onto the message by his email program "without regard to the applicability of the statute of frauds to the particular document." *Mark Bruce Int'l, Inc.*, 19 Misc.3d 1140(A), at *5.

 Furthermore, in addition to needing to show the existence of a signed writing, the defendants must also demonstrate that such writing effectively waived the plaintiff's rights under the contract.

Under New York law, waiver of a contract right is "the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." "Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish [his] known right." Whether a party had the intent to waive is usually a matter of fact.

*Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp.2d 507, 516 (S.D.N.Y. 2009) (quoting *Jefpaul Garage Corp. v. Presbyterian Hosp.*, 61 N.Y.2d 442, 474 N.Y.S.2d 458, 462 N.E.2d 1176, 1177 (1984); *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir.2006)) (internal citations and quotations omitted) (alterations in original).

The parties disagree about whether Marchi's email demonstrates the requisite intent to waive the no-oral-termination clause in the 2007 Agreement. To support their position that the written notice requirement was waived, the defendants point to the language Marchi used in the June 7, 2007 email: "A couple things to close the project.... My lawyers need to review the language in your nda with cbre since[ ] Bulldog owns the IP. I think that's it. Outside of Coke, full speed ahead and thanks again for the support." (Ex. 21 to Defs.' Local Rule 56(a)1 Statement (Doc.

No. 139–21), at 1.) The defendants also highlight Marchi's deposition testimony:

Q: What did Ms. Mangelsdorf tell you in the call on June 6th or 7th, 2007?

A: She said, "I have some bad news. We're not going forward with the project that you've been working on for awhile." [sic] ...

Q: When the conversation concluded, was there any doubt in your mind that Pepsi was terminating the letter of intent?

A: After the phone call, obviously I understood that Pepsi was terminating....

Q: Did you do any work in furtherance of the agreement you had with Pepsi in the letter of intent after the phone call with Ms. Mangelsdorf?

A: The only thing I did to close the loop on the project was send her an e-mail, I believe to the extent saying that, you know—I don't remember exactly what the e-mail stated, but it was to kind of say, you know, "here it is. I'm moving forward or onward and upward." I don't remember precisely what the e-mail said.

(Ex. 8 to Defs.' Local Rule 56(a)1 Statement (Doc. No. 139–8), at 187–189.) PCAM contends that these statements by Marchi demonstrate that after the phone call with Mangelsdorf it was his understanding that the Bulldog LOI was terminated, and that his follow up email constituted a waiver of his right to receive notice of that termination in writing.

However, neither Marchi's email nor his deposition testimony definitively demonstrates that he intended to waive his right to written termination. There is a genuine issue as to whether the actions Marchi took were merely a prudent attempt to minimize his losses in the face of the de-

fendant's clear intention to no longer perform under the contract. The court in *Colman & Hirschmann, Inc. v. Little Tikes, Inc.*, No. 84 Civ. 1296(JMW), 1986 WL 4688 (S.D.N.Y. Apr. 17, 1986) found a similar justification for the plaintiff's actions in a case where "the plaintiff had actual notice from the oral communication [of termination] . . . and [the plaintiff] took the steps it did in contemplation of termination. . . ." *Id.* at *5. In that case the court held that those steps the plaintiff took were "not relevant" to the waiver issue and that

> [t]here was no waiver of the written notice requirement and [the plaintiff's] notification of its employees [of the termination] and representation of [a competitor of the defendant] were prudent business steps in light of [the defendant's] expressed intent to terminate. Written notice was required and without it there was no termination.

*Id.*

PCAM argues that, even if Bulldog did not waive this provision, summary judgment on the breach of contract claim is appropriate because Bulldog is estopped from claiming that the contract was not terminated as a result the actions Marchi took after the June 6, 2007 call and email. PCAM cites to a number of cases to support the proposition that a "party who treat[s] [a] contract as terminated [is] estopped from relying on N.Y. G.O.L. § 15–301 to contest termination." (Defs.' Mem. Supp. Mot. Summ. J. (Doc. No. 138), at 15 n. 8.) However, all of these cases are distinguishable. In *Rose v. Spa Rlty. Assoc.*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977), for example, the New York Court of Appeals was considering an oral modification to, not an oral termination of, a contract, and the actions taken by the party claiming § 15–301 prevented the modification had induced reliance on

the modification from the other party. The court stated that "[o]nce a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking [§ 15–301] to bar proof of that oral modification." *Id.*, 397 N.Y.S.2d 922, 366 N.E.2d at 1283. Here, there is no evidence that Bulldog's actions induced any reliance from PCAM, or that PCAM would have acted differently if not for Bulldog's conduct.

Additionally, the court declines to follow the holding in *Digital Broad. Corp. v. Ladenburg, Thalmann & Co., Inc.*, No. 117041/05, 2008 N.Y. Misc. LEXIS 10179, at *16–17 (N.Y.Sup.Ct. Dec. 11, 2008), that when "[t]he undisputed evidence demonstrates that [the plaintiff] itself treated the relationship as terminated . . . . [the plaintiff] is estopped from relying on section 15–301(2) to contest the alleged termination of the Agreement." This holding was based on a statement by the New York Court of Appeals in *Rose* that was itself derived from that court's earlier opinion in *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380–81 (1919). However, as recognized by the court in *Israel v. Chabra*, 12 N.Y.3d 158, 878 N.Y.S.2d 646, 906 N.E.2d 374 (2009), the amendments to § 15–301 abrogated the holding in *Beatty*. *See Israel*, 878 N.Y.S.2d 646, 906 N.E.2d at 380. In fact, all of the cases cited by PCAM in support of its estoppel theory predate *Israel*.

Finally, the Second Circuit has recognized that "[s]ummary judgment [is] inappropriate on th[e] issue" of estoppel, because "there is an issue of fact whether [the plaintiff] is estopped from denying that the contract had terminated." *Zolar Pub. Co., Inc. v. Doubleday & Co., Inc.*, 529 F.2d 663, 667 (2d Cir.1975). Therefore, Bulldog's reliance on the defendants' oral notification that they no longer in-

tended to perform under the contract does not as a matter of law estop Bulldog from claiming that the contract was not terminated. This reliance does, however, have an effect on the damages Bulldog may be able to claim as a result of any breach, which is discussed below.

Thus, because there is no indisputable evidence that Marchi's email either satisfies the signed writing requirement, conveys his intent to waive, or estops him from arguing that the contract was not terminated, a genuine issue of fact exists as to the end date of the contract.

However, this issue of fact is not dispositive of the instant motion; rather the existence of this issue requires the court to assume a termination date of September 15, 2007, as that assumption favors the non-movant.

Bulldog claims that PCAM breached its obligations under the contract by failing to maintain in confidence Bulldog's confidential and proprietary information, and by failing to perform its obligations to Bulldog in good faith. With respect to the breach of confidentiality claim, Bulldog does not specify precisely what confidential or proprietary information it claims PCAM shared with Xanadu; it appears that the information on which it bases its claim is that described on pages 20 to 24 of Bulldog's memorandum: (i) "glowing tables that simulate ponds that respond to touch with text or other images rising from below"; (ii) "a large LED sign ... the displays the Pepsi logo and also displays other images"; (iii) "an interactive, glassenclosed, climate controlled capsule [in which visitors would ride] to a height of 300 feet offering sweeping views of New York's skyline"; (iv) the fact that the location "would be green powered, including using power generated from wind energy"; (v) "an adjacent indoor facility containing displays that 'previewed new Pepsi commercials,

historical commercials and allowed the occupant to play a New York trivia game for a prize to [be] redeemed at the Pepsi World gift shop'"; (vi) "the incorporation of unique recycling receptacles (tubes) throughout the venue"; (vii) an area where, "after purchasing tickets for the ride, the guests 'stood on line watching Pepsi commercials and music videos from all over the world on screens in the queuing area'"; and (viii) a concept "where a picture is taken of the occupants [of the ride], and this picture is electronically transmitted to Pepsi's website where it can be viewed by friends and family." (Pl.'s Mem., at 20–24.)

To the extent that this information is covered by the confidentiality provision in the Bulldog LOI, an issue that the court does not reach, Bulldog has not provided sufficient evidence to demonstrate that there is a genuine issue of material fact regarding PCAM's claimed misappropriation. Both Leshem and Mangelsdorf aver that no confidential information was shared. In response, Bulldog argues that since

> Mangelsdorf was the project leader on both competing projects, [and] had creative input and was exposed to confidential concepts and designs that were similar in nature (e.g. interactive and experiential elements, molecules, bubbles, carbonation, etc.), [this situation] is not unlike those cases in which misappropriation of trade secrets is presumed under the doctrine of inevitable disclosure.

(*Id.* at 21.) However, assuming that the facts here would satisfy the requirements for demonstrating inevitable disclosure, the "[p]laintiff cites no cases—nor has independent research yielded any—in which the risk of inevitable disclosure has been held sufficient to raise a triable issue of fact so as to defeat summary judgment."

*Metito (Overseas) Ltd. v. General Electric Co.*, No. 05 Civ. 9478(GEL), 2009 WL 399221, at \*11 (S.D.N.Y. Feb. 18, 2009). As the court in *Metito* points out, the doctrine of inevitable disclosure is generally considered in the context of a motion for preliminary injunction. "Extension of the doctrine to the present context, if ever appropriate, would at a minimum require a very strong showing that disclosure is truly inevitable." *Id.* Bulldog has made no such showing, but has instead merely concluded that it would be "impossible for Bulldog's trade secret information, known by Mangelsdorf, to not [a]ffect her work in and influence her decisions with respect to the development of the concepts and designs of the Xanadu project." (Pl.'s Mem., at 22.) This conclusory assertion is not sufficient to make the requisite strong showing that disclosure was inevitable, and, in any case, PCAM has produced evidence that any input Mangelsdorf had on the Xanadu Project did not relate to the creation or inclusion of the elements Bulldog claims were misappropriated from its proposal. Thus, Bulldog has not demonstrated that there is a genuine issue of material fact concerning the breach of the confidentiality provision of the Bulldog LOI.

With respect to the other aspect of Bulldog's breach of contract claim, PCAM asserts that any agreements involving promises to work in good faith with Bulldog were non-binding since they were "either too preliminary or indefinite to be enforceable" under New York law. (Defs.' Mem., at 18.) "The Second Circuit has interpreted New York law as having two types of preliminary agreements that creating binding obligations: 'Type I' and 'Type II.' " *EQT Infrastructure Ltd. v. Smith*, 861 F.Supp.2d 220, 226 (S.D.N.Y.2012) (citing *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir.2005)).

The hallmark of a Type I agreement is that the parties have agreed to all necessary elements of the contract and are, therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced.... The category of Type I preliminary agreements is ... limited to agreements that are "preliminary" in name only.

*Brown*, 420 F.3d at 154. The Bulldog LOI does not satisfy the requirements for a Type I preliminary agreement, at least not with respect to the sections Bulldog claims were breached, because those sections clearly call for more negotiation regarding necessary elements such as the scope of work or the identity of the owner/operator of the Bulldog Project.

 However, New York law also recognizes Type II preliminary agreements, which the Second Circuit describes as being "created when the parties agree on certain major terms, but leave other terms open for further negotiation." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998).

Under New York law parties who enter into [Type II] agreements ... "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement...." These agreements do not commit the parties to reach their ultimate contractual objective; instead, such agreements create an "obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." This obligation bars a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."

*L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir.2011) (quoting *Teachers Ins. and Annuity Ass'n of America v. Tribune Co.*, 670 F.Supp. 491, 498

(S.D.N.Y.1987); *Adjustrite*, 145 F.3d at 548) (internal citations omitted). Courts applying New York law examine five "considerations relevant to whether a preliminary agreement is a binding Type II agreement":

"(1) whether the intent to be bound is revealed by the language of the agreement;

(2) the context of the negotiations;

(3) the existence of open terms;

(4) partial performance; and

(5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."

*Brown*, 420 F.3d at 157. Evaluated using these considerations, the Bulldog LOI appears to qualify as a Type II preliminary agreement. First, the intent of the parties to be bound by the Bulldog LOI is demonstrated by the language of the letter. The Bulldog LOI begins: "This *binding* letter of intent sets forth the basic terms for the business relationship between Pepsi–Cola Advertising and Marketing, Inc. ("Pepsi") and Bulldog New York, LLC ("Bulldog")...." (Ex. 16, at 1 (emphasis added).) Furthermore, although it is not part of the "language of the agreement," the final termination letter PCAM sent to Bulldog reiterates the parties' belief that they had a *"binding* letter of intent dated May 18, 2007...." (Ex. CC. to Pl.'s Local Rule 56(a)2 Statement (Doc. No. 148–29), at 2 (emphasis added).) Taking the text of the two documents together, it appears that the parties intended the Bulldog LOI to be binding.

The second factor also appears to favor finding that a binding preliminary agreement existed. Like the project at issue in *Brown*, the Bulldog Project "was subject to numerous contingencies that had the potential to dramatically affect plan-

ning, execution, and management. It was in this context that the parties elected to negotiate a general framework within which they could proceed while preserving flexibility in the case of uncertainty." *Brown*, 420 F.3d at 158. The court in *Brown* found that in such a context, parties may opt "for a more open arrangement," and Type II agreements are "consistent with the context of [such] negotiations." *Id.*

Similarly, the third factor also favors finding a Type II agreement exists because "where the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, ... these same omissions may actually supporting finding a binding Type II agreement." *Id.* Here, the parties left open several important terms, but still entered into what they characterized as a "binding letter of intent." While the presence of these terms counsels against finding there is a Type I preliminary agreement that is enforceable as to the ultimate goal, their presence supports a finding that the parties entered into a Type II agreement.

With respect to the fourth factor, the evidence suggests that Bulldog performed under the terms of the Bulldog LOI, at least up until June 7, 2007. Furthermore, Bulldog continued to perform beyond that date under certain portions of the contract, namely the exclusivity provision. This partial performance "cuts strongly in favor of finding the [Bulldog LOI] to be a Type II agreement." *Id.*

As to the final factor, the court does not have enough information to determine what "the customary form" is for transactions similar to the one at issue here, and thus cannot conclude which outcome this factor favors. However, even when courts have found that the final form of the agreement customarily is put into writing,

they have held that " 'Type II agreements, by definition, comprehend the necessity of future negotiations and contracts,' ... so that necessity—explicitly contemplated here ...—does not preclude a finding of a Type II agreement." *EQT Infrastructure Ltd.*, 861 F.Supp.2d at 230 (Quoting *Brown*, 420 F.3d at 158). Therefore, this factor "is essentially neutral in this case." *Id.*

Finally, the statements set forth in the paragraph entitled "Next Phase" specifically note that the parties will work together in "good faith over the next 120 days" to consummate the "next phase of the Project." (Ex. 16, at 1.) This language evokes "[t]he essence of a Type II preliminary agreement" in that "it creates an 'obligation to negotiate the open issues in good faith in an attempt to reach the [ultimate contractual objective] within the agreed framework.' " *Brown*, 420 F.3d at 157 (quoting *Tribune*, 670 F.Supp. at 498) (alterations in original). Therefore, since the language used strongly suggests that a Type II preliminary agreement was made, and the majority of the considerations support this conclusion, the court holds that the parties were under an obligation to negotiate in good faith.

The plaintiff claims that PCAM breached this obligation by failing to (a) work in good faith with Bulldog for 120 days following execution of the Agreement, to develop the Bulldog Project; (b) work with Bulldog, following the 120–day period, to recruit a third party to be the owner/operator of the Bulldog Project; (c) use its best efforts to assist and support Bulldog in its efforts to negotiate a business deal with a third-party owner operator; (d) pay Bulldog a bonus in an amount expressly set forth in the Bulldog LOI; and (e) reach an agreement with Bulldog on additional compensation for the Bulldog Project. The claims in ¶ 93(b), (d) and (e)

of the Amended Complaint cannot be maintained at the summary judgment phase because the transaction was not eventually consummated. For Type II preliminary agreements, the parties have

> no right to demand performance of the transaction. Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing.

*Adjustrite Sys., Inc.*, 145 F.3d at 548; *see also L–7 Designs*, 647 F.3d at 431; *Tribune*, 670 F.Supp. at 498. Therefore, because the transaction was never consummated, claims with respect to obligations after the initial 120–day period cannot be maintained, and PCAM is entitled to summary judgment on these parts of the plaintiff's breach of contract claim.

With respect to the remaining claims in ¶ 93 of the Amended Complaint, PCAM states—without providing citations to evidence—that "undisputed evidence demonstrates that ... PCAM continued to work toward and consider the Project in good faith, and there is no evidence to the contrary." (Defs.' Reply Supp. Mot. Summ. J. (Doc. No. 155), at 5.) A number of e-mails between the parties tend to suggest that PCAM was working toward and considering the Bulldog Project in good faith with Bulldog between the signing of the Bulldog LOI and June 7, 2007. On the other hand, however, Dawn Hudson, a representative of PCAM wrote to Lon Schwear, of Ozz Marketing, on May 9, 2007, at 10:49 PM: "We are evaluating 3 major properties on both[ ] coasts right now. I'd be interested in your [point of view]. Please don[']t mention to David [Marchi]. I'm not sure we will go to the next phase, even although [I] agree with you that it is fantastic ... but never say never." (Ex. II to

Pl.'s Local Rule 56(a)2 Statement (Doc. No. 148–35), at 5.) This e-mail, close to the time of the signing of the Bulldog LOI, would tend to support an argument that PCAM lacked good faith in its dealings with Bulldog at that point. In addition, Bulldog has produced evidence demonstrating that PCAM was simultaneously negotiating with Bulldog and Xanadu Ventures, and was fully aware that it could not execute both projects.

As discussed above, the court assumes for purposes of the defendants' motion for summary judgment that the contract was not terminated until September 2007. Thus, there also exists a genuine issue of material fact with respect to whether PCAM was acting in good faith when it attempted the verbal termination. Although PCAM is correct that, under New York law, "[a] party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive," *Big Apple Car, Inc. v. City of New York,* 204 A.D.2d 109, 111, 611 N.Y.S.2d 533 (N.Y.App.Div.1994), at issue here is not PCAM's reasons for termination, but rather whether PCAM was acting in god faith when it stopped working toward and considering the Bulldog Project before reaching the end of even the 120–day period.

Thus, "[s]ince courts do not themselves weigh evidence at the summary judgment stage, this standard requires [the court] to determine whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve." *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir.2011). Bulldog has produced sufficient evidence to demonstrate that genuine issues of material fact exist with respect to whether

PCAM continued to work toward and consider the Bulldog Project in good faith.

█ However, Bulldog fails to produce evidence that could establish the fourth element of a breach of contract claim: damages. In situations where a defendant has breached a Type II Agreement by failing to negotiate in good faith, "lost profits are generally not available where no agreement is reached, [but] out-of-pocket costs may still be appropriate." *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.,* 765 F.Supp.2d 403, 417 (S.D.N.Y.2011) (footnotes omitted). Here, PCAM's purported oral termination resulted in Bulldog having no out-of-pocket expenses caused by PCAM's failure to negotiate in good faith. Bulldog has produced no evidence of, or even given any indication of, what damages it claims to have suffered either through PCAM's improper termination or through PCAM's bad faith dealing. Bulldog "also fails to offer any evidence that it would have behaved differently if [PCAM] had sent it a written termination notice." *Digital Broad. Corp.,* 2008 N.Y. Misc. Lexis 10179, at *15. The only damages Bulldog appears to claim relate to its expected profits from the Bulldog Project, which are unavailable for breach of a Type II agreement.

Thus, while Bulldog has demonstrated that genuine issues of material fact exist with respect to whether PCAM continued to work toward and consider the Bulldog Project in good faith as required under the Bulldog LOI, it has not created a genuine issue of material fact with respect to the damages element of its breach of contract claim. Therefore, because proving damages is a necessary element of a breach of contract claim under New York law, the defendants' motion for summary judgment is being granted as to Count 1 of the First Amended Complaint.

### 2. Count 3: Misappropriation of Trade Secrets

In Count 3, Bulldog claims that trade secrets, which were not known outside of Bulldog, Pepsi, and those who signed non-disclosure agreements, were misappropriated by the defendants. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir.2009) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999) (applying New York law)). The defendants contend that no information contained in the Bulldog Project was a protectable trade secret, and, even if there was protectable information, such information was never misappropriated.

In terms of what constitutes a trade secret, under New York common law [a] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it. In determining whether information constitutes a trade secret, New York courts have considered: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Faiveley Transport*, 559 F.3d at 117 (internal citations omitted.) Additionally, under New York law, "a trade secret must be used secretly and continuously in commerce." *Hudson Hotels Corp. v. Choice Hotels Intern.*, 995 F.2d 1173, 1177 (2d Cir.1993), *abrogated on other grounds by Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir.2000). Therefore, "'the commonly accepted common law definition of a trade secret "does not include a marketing concept or new product idea" submitted by one party to another.'" *Id.* at 1176 (quoting 2 R. Milgrim, *Milgrim on Trade Secrets* § 8.03, at 8–31 (1992 & Supp. 1992)). These are excluded from trade secret protection "because[ ] once [they are] marketed, the idea will no longer be a secret." *Scienton Tech., Inc. v. Computer Assoc. Int'l Inc.*, No. 04–CV–2652(JS)(ETB), 2013 WL 1856653, at *4 (E.D.N.Y. May 1, 2013); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 499 (S.D.N.Y.2002) ("Similar to the architecture of a building, once the combination of [the plaintiff's] elements is seen by the public, the system's architecture will become obvious and easily duplicated."). Thus, while "'secrecy is a question of fact,' courts have held that there can be no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or product is placed on the market." *Id.* at 498 (internal citations omitted) (quoting *Lehman v. Dow Jones, & Co., Inc.*, 783 F.2d 285, 298 (2d Cir.1986)).

Here, any trade secrets claimed by Bulldog would fall squarely into the category of "marketing concept or new product idea" the secrecy of which was intended to be lost once they were revealed to the public. To the extent that Bulldog identifies any of its claimed trade secrets in its papers, it is evident that this

information was marketed to the defendants, could have been marketed to others, and was intended to eventually be exposed to the public, necessarily resulting in secrecy being lost. In addition, the information Bulldog provided to the defendants was not used by Bulldog continuously and secretly in its business to give it a competitive edge. This information "was not used to run [Bulldog's] business, but was its *product:* like the car that rolls off the production line, this information is what [Bulldog] had to sell." *Lehman,* 783 F.2d at 298 (emphasis in original). Thus, "[o]nce [the Bulldog Project was] built, marketed, and occupied, the features of the [experience] would necessarily be disclosed publicly" and therefore "could not constitute a protectable trade secret because, from that time forward, it could not be used secretly and continuously in its business." *Hudson Hotels,* 995 F.2d at 1177.[4]

Therefore, there is no genuine issue of material fact as to whether Bulldog conveyed protected trade secrets to the defendants, and the motion for summary judgment is being granted as to Count 3 of the First Amended Complaint.

### 3. Count 4: Tortious Interference with Business Relations

In Count 4, Bulldog brings a claim for tortious interference, which, as explained above, the court construes as being brought under a theory of tortious interference with business relations.

> [T]o prevail on a claim for tortious interference with business relations … under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.

*Catskill Development, L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir.2008). Bulldog claims that because of the defendants' conduct, "third parties were no longer interested in working with Bulldog, specifically citing Pepsi's involvement in Xanadu." (Pl.'s Mem., at 34.) However, the defendants' entering into a business venture with a competitor of Bulldog does not, standing alone, constitute the basis for a claim for tortious interference with business relations:

> The wrongful means requirement makes alleging and proving a tortious interference claim with business relations "more demanding" than proving a tortious interference with contract claim. The standard is more demanding because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the "competing interest of the interferer," as well as the broader policy of fostering healthy competition.

*Catskill Development,* 547 F.3d at 132 (relying on New York law) (internal citations omitted). Also, although "a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means," *id.,* the fourth element of the tortious interference standard requires that the

---

4. The court is aware that the holding in *Hudson Hotels* dealt specifically with trade secret protection post-commercialization of the new product idea, and that the court acknowledged that "the question whether a marketing concept or a new product idea can constitute a trade secret is murkier." *Hudson Hotels,* 995 F.2d at 1177. However, subsequent decisions by New York courts, as well as other federal circuit courts, have held that a pre-commercialized new product idea is also not a protected trade secret because once it is marketed it will no longer be secret. *See Scienton Tech.,* 2013 WL 1856653, at *4 (collecting cases).

plaintiff can " 'demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations.' " *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 171 (2d Cir.2004) (quoting *Pacheco v. United Medical Assoc., P.C.,* 305 A.D.2d 711, 712, 759 N.Y.S.2d 556 (N.Y.App.Div.2003)) (emphasis in original).

Although there is a genuine issue of fact as to whether Pepsi's conduct in connection with the Bulldog Project constitutes an "independent tort," thereby satisfying the third element of the standard, Bulldog has produced no evidence showing that Pepsi's conduct was the proximate cause of the harm it claims in Count 4. There is no evidence as to the purported reason why the third parties no longer wanted to work with Bulldog, *i.e.* that Bulldog's original ideas were incorporated into the Xanadu Project. Rather Bulldog's contention is supported only by Bulldog's response to an interrogatory. This is insufficient, as a matter of law, to create a genuine issue of material fact because it relies upon the speculation of the plaintiff as to the reasons for the third parties' lack of involvement. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

While it may be true that if Pepsi had chosen to proceed with the Bulldog Project, as opposed to the Xanadu Project, the business relations Bulldog refers to would have come to fruition, this alone does not establish proximate cause. All Bulldog has shown is that these third parties did not enter into a relationship with Bulldog because the Bulldog Project did not progress beyond the letter of intent stage. However, as discussed in connection with Count 1 above, the defendants were under no obligation to move forward with the Bulldog Project. Therefore, Bulldog is unable to establish the requisite causal connection between the alleged bad acts and the harm it claims in Count 4, because this same harm could have occurred even without the alleged bad acts.

Bulldog has produced no evidence that creates a genuine issue of material fact with respect to whether the defendants' alleged conduct proximately caused injury to its business relations with third parties. Therefore, the motion for summary judgment is being granted as to Count 4 of the First Amended Complaint.

## IV. Conclusion

For the reasons set forth above, the defendants' Motion for Summary Judgment (Doc. No. 136) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.